**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-3618, 10-3651, 10-3652 & 10-3798
_____

JOHN M. DEWEY; PATRICK DEMARTINO;
PATRICIA ROMEO; LYNDA GALLO; RONALD B.
MARRANS; EDWARD O. GRIFFIN, ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED

v.

VOLKSWAGEN AKTIENGESELLSCHAFT;
VOLKSWAGEN BETEILIGUNGS GESELLSCHAFT
M.B.H.; VOLKSWAGEN GROUP OF AMERICA, INC.
(FORMERLY KNOWN AS VOLKSWAGEN OF
AMERICA, INC.); AUDI AG; VOLKSWAGEN
GROUP OF AMERICA, INC., d/b/a AUDI OF
AMERICA, INC.; AUDI OF AMERICA, LLC;
VOLKSWAGEN DE MEXICO, S.A. DE C.V.

(D.N.J.  07-cv-02249)
_____

JACQUELINE DELGUERCIO; LYNDA GALLO;
FRANCIS NOWICKI; KENNETH BAYER,

1

INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED

v.

VOLKSWAGEN AMERICA, INC.; VOLKSWAGEN
GROUP OF AMERICA, INC.; VOLKSWAGEN OF
AMERICA, INC., d/b/a AUDI OF AMERICA, INC.;
VOLKSWAGEN AG; AUDI AG; VOLKSWAGEN DE
MEXICO, S.A. DE C.V.; ABC ENTITIES 1-20

(D.N.J. 07-cv-02361)
_____

Lester Brickman, Darren McKinney, Michael Sullivan,
Joshua West,

Appellants in 10-3618

Volkswagen Group of America, Inc. s/h/a Volkswagen of
America, Inc., Volkswagen AG, Volkswagen de Mexico,
S.A. de C.V., Audi of America, LLC, Audi AG, and
Volkswagen Beteiligungs Gesellschaft M.B.H.,

Appellants at 10-3651

John M. Dewey, Patrick DeMartino, Patricia Romeo,
Ronald B. Marrans, Edward O. Griffin, Jacqueline
DelGuericio, Lynda Gallo, Francis Nowicki,
Kenneth Bayer,

Daniel Sibley, David Stevens,

Appellants in 10-3798
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court  Nos. 2-07-cv-02249 & 07-cv-02361
Magistrate Judge: The Honorable Patty Shwartz

Argued March 27, 2012

Before: FUENTES, SMITH, and JORDAN, *Circuit Judges*

(Filed:  May 31, 2012)

Angelo J. Genova
Dina M. Mastellone
Genova Burns Giantomasi & Webster
494 Broad Street
6th Floor
Newark, NJ  07102

Jay P. Saltzman
Samuel P. Sporn     [ARGUED]
Schoengold & Sporn
19 Fulton Street

Suite 407
New York, NY  10038

*Counsel for John M. Dewey, Patrick DeMartino, Patricia Romeo, Ronald B. Marrans & Edward O. Griffin*

Adam M. Slater     [ARGUED]
Matthew R. Mendelsohn
Mazie, Slater, Katz & Freeman
103 Eisenhower Parkway
Roseland, NJ  07068

*Counsel for Jacqueline Delguercio, Lynda Gallo & Francis Nowicki*

Jeffrey L. Chase     [ARGUED]
Keith A. Frederick
Herzfeld & Rubin
125 Broad Street
New York, NY  10004

Peter J. Kurshan
Chase, Kurshan, Herzfeld & Rubin
354 Eisenhower Parkway
Suite 1100
Livingston, NJ  07039

*Counsel for Defendants Volkswagen of America, Inc., Audi of America, LLC, Volkswagen AG, Audi AG, Volkswagen Beteiligungs Gesellschaft M.B.H., Volkswagen de Mexico, S.A. de C.V., Volkswagen Group of America, Inc. & Volkswagen Group of America, Inc., d/b/a Audi of America, Inc.*

Theodore H. Frank     [ARGUED]
Center for Class Action Fairness
1718 M Street, N.W.
No. 236
Washington, DC  20036
        *Counsel for Lester Brickman, Darren McKinney,*
        *Michael Sullivan & Joshua West*

Gary W. Sibley, Esq.
The Sibley Firm
2414 North Akard
Suite 700
Dallas, TX  75201

David M. Nieporent
Samuel & Stein Law Office
38 West 32nd Street
Suite 1210
New York, NY  10001
        *Counsel for Daniel Sibley & David Stevens*

————————————

OPINION

————————————

SMITH, *Circuit Judge.*

This appeal arises from the certification of a class,

the approval of a settlement, and the award of attorneys' fees in a products liability suit concerning defective cars manufactured by Volkswagen of America, Inc., Audi of America, Inc., and related entities (collectively, "Volkswagen").[1]  As part of the settlement, one group of class members (the "reimbursement group") received the right to reimbursement for certain qualifying damages, paid from an $8 million fund.  The remaining class members (the "residual group") were required to wait until the reimbursement group made its claims.  The residual group could then make "goodwill" claims on the remaining money in the fund.  Those monies were to be distributed *pro rata* amongst the residual claimants.  The District Court certified a single class containing both the reimbursement group and the residual group.  On appeal, objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan (collectively the "West Objectors") argue that the representative plaintiffs in this suit, all members of the reimbursement group, cannot adequately represent the interests of the class members in the residual group.  We agree.  We conclude that the interests of the representative plaintiffs do not sufficiently align with those of the unnamed plaintiffs in the residual group, and that the class thus fails to satisfy

---

[1] The full list of defendants includes: Volkswagen of America, Inc.; Volkswagen AG; Volkswagen Beteilingungs Gesellschaft M.B.H.; Audi of America, Inc.; Audi AG; Volkswagen de Mexico, S.A. de C.V.; Volkswagen Group of America; and Audi of America, LLC.

Federal Rule of Civil Procedure 23(a)(4). We will reverse the District Court's order certifying the class and remand for further proceedings.

I.

A.

In May 2007, two groups of plaintiffs (the "Dewey plaintiffs" and the "Delguercio plaintiffs") filed separate class action suits against Volkswagen. On June 22, 2007, the cases were consolidated for pre-trial purposes because they raised substantially similar allegations: that several models of Volkswagen and Audi automobiles had defectively designed sunroofs that, when clogged by plant debris and pollen, allowed water to leak into the vehicle. While leakage could be prevented through regular cleaning and maintenance, Volkswagen allegedly failed to inform car owners of these preventive measures because such a disclosure would acknowledge a design defect, and would likely obligate Volkswagen to cover any resulting damage under their warranty program.

The Dewey plaintiffs allege: (1) violations of New Jersey's Consumer Fraud Act ("NJCFA"); (2) violations of the Uniform Commercial Code ("UCC"); (3) common law fraud; (4) negligent misrepresentation; and (5) breach of the duty of good faith and fair dealing. The Delguercio plaintiffs allege: (1) breaches of express and implied warranties; (2) improper repairs of vehicles; (3) breach of the covenant of good faith and fair dealing; (4) negligent misrepresentations; (5) violations of the

7

NJCFA; (6) unjust enrichment; and (7) fraud.

After two years of discovery, the parties notified the Court that they were entering into settlement negotiations. The Court suspended pretrial deadlines and set a deadline for a joint motion for preliminary settlement approval. On November 10, 2009, the District Court approved the parties' request to refer the case to a magistrate judge "to conduct all settlement proceedings and enter final judgment." The case was referred to Magistrate Judge Patty Shwartz.

B.

On January 29, 2010, the parties filed a joint motion for preliminary approval of a settlement, preliminary certification of a class, and appointment of class counsel. The parties requested certification of the following class:

(a)    all Persons, other than officers, directors, or employees of the defendants, who purchased or leased, new or used, the following settlement class vehicles:

- 2001-2007 Volkswagen New Beetle vehicles with Vehicle Identification Numbers (VINs) below 3VW---1C-7M514779, equipped with sunroof;

- 2001-2005 Jetta A4 Sedan with VINs with "9M" in position 7 and 8, and 2001-2005 Volkswagen Jetta Wagon A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;

- 2001-2006 Volkswagen Golf A4, Volkswagen GTI A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;

- 2005-2007 Volkswagen Jetta A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 2006-2007 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1999-2005 Volkswagen Passat B5 vehicles;

- 1997-2006 Audi A4 vehicles, B5 and B6 Platforms in MY2005, with VINs with "8E" in position 7 and 8 with also "J" or "L" or "V" or "P" or "X"

9

in position 4, and MY2005 and MY2006, with VINs with "8H" in position 7 and 8 (including Cabrio, S, and RS versions);

- 1998-2005 Audi A6 C5 vehicles with VINs with "4B" in position 7 and 8 (including Allroad, S, and RS versions);

[the "reimbursement group"]

and

(b) all persons, other than officers, directors, or employees of the defendants, who currently own or lease the following settlement class vehicles:

- 1998-2000 and 2007-2009 Volkswagen New Beetle with VINs 3VW---1C-7M514779 or higher, equipped with sunroof;

- 1997-1999 Volkswagen Jetta A3 with VINs with "1H" in position 7 and 8, 1999-2000 Volkswagen Jetta A4s with VINs with "9M" in position 7 and 8, and 2008-2009 Volkswagen Jetta A5 vehicles

10

with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1997-1999 Volkswagen Golf/GTI A3 with VINs with "1H" in position 7 and 8, 1999-2000 Volkswagen Golf/GTI A4 with VINs with "1J" in position 7 and 8, and 2008-2009 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1998 Volkswagen Passat B5 vehicles;

- 1997 Volkswagen Passat B4 and 2006-2009 Volkswagen Passat B6 vehicles equipped with sunroof;

- 2004-2009 Volkswagen Touareg vehicles;

- 2005-2008 Audi A4 B7 Platform vehicles equipped with sunroof, in MY2005, with VINs with "8E" in position 7 and 8 and also "A" or "D" or

"K" or "G" or "U" in position 4 (including S and RS versions);

- 1997 Audi A6 C4 vehicles;

- 2005-2009 Audi A6 C6 vehicles equipped with sunroof with VINs with "4A" or "4F" in position 7 and 8 (including S and RS versions);

- 1997-2009 Audi A8 vehicles (including S versions)

[the "residual group"]

App'x A13-14. All of the representative plaintiffs in the case are members of the reimbursement group.

The settlement agreement made three types of relief available to the class. First, the settlement agreement provided that all class members would receive "[e]ducational preventative maintenance information." App'x A317. This information instructed class members how to inspect and clean their sunroofs to avoid leakage.

Second, the settlement agreement designated certain car models in the reimbursement group whose owners or lessees would be eligible to take their cars to any authorized Volkswagen dealership for removal of a problematic valve on the sunroof and for inspection of

12

the sunroof drains and drain hoses. These service actions would be performed free of charge to the class member.

Finally, the settlement agreement created an $8 million reimbursement fund that would be made available to reimburse class members for certain "reimbursable repairs."[2] The settlement agreement provided that the claims administrator would satisfy all claims made by members of the reimbursement group for reimbursable repairs. If the $8 million reimbursement

[2] The agreement defined "reimbursable repairs" as:

> cleaning, drying or replacement of carpeting, including padding, and/or repair or replacement of [specified components], and/or repair and replacement of any component of the sunroof drain system and/or plenum drain system, in response to a documented customer complaint or report of water entering the passenger compartment through or due to the sunroof drain system or plenum area . . . of a Settlement Class Vehicle . . . which cleaning, drying, or repair or replacement was performed prior to the date on which Notice is mailed by the Settlement Administrator and for which Proof of Repair is timely tendered.

App'x A311.

fund was not sufficient to satisfy these claims, the claims would be "made on a pro rata basis." App'x A320. If there was money remaining in the fund after these reimbursement claims were settled, it would be used to satisfy "goodwill" claims consisting of: (1) reimbursement claims made by members of the residual group; and (2) reimbursements for nonreimbursable repairs paid for by members of the reimbursement group. App'x A321. The fund would accept goodwill claims up to five years after the effective date of the settlement.[3] App'x A321-22. Five years after the effective date, any money remaining in the fund would be "donated to an educational, charitable, and/or research facility in the United States and dedicated to specific projects and programs benefitting automobile safety and/or environmental technology . . . ." *Id.*

The District Court preliminarily approved the settlement, preliminarily certified the class, and appointed class counsel. The District Court's Order required that notice be communicated in three different ways: (1) direct mail to all class members for whom mailing addresses were available; (2) a class website with an electronic version of the mailed notices and a claim form; and (3) publication in *USA Today*. This notice was

---

[3] The effective date was "the first date on which all appellate rights with respect to the Judgment have expired or have been conclusively exhausted in a manner that affirms the Judgment." App'x A307.

14

sent to approximately 4.2 million Volkswagen owners and 2.1 million Audi owners.[4]

The District Court ordered the representative plaintiffs to file a memorandum in support of final settlement approval by June 17, 2010, with opposition briefs due June 28, 2010.[5] The court also scheduled a

---

[4] In June 2010, the parties mailed a second set of notices to owners of approximately 550,000 class vehicles who did not receive the first notice.

[5] On July 12, 2010, after the June 28, 2010 deadline had passed, the West Objectors moved for leave to file a response to plaintiffs' memorandum in support of final settlement approval. The District Court denied the West Objectors' motion. On appeal, the West Objectors argue that they were denied due process because the District Court required that they file their objection before representative plaintiffs filed their fee petition. As the District Court noted in its opinion, the West Objectors misunderstand the court's scheduling order. The West Objectors had until June 21 to file an opposition to the fee petition, and until June 28 to file an opposition to plaintiffs' memorandum in support of final certification. The West Objectors missed *both* of these deadlines. Having cited no case law suggesting that due process requires a District Court to allow objectors to file such untimely response briefs, we conclude that the West Objectors had a "reasonable opportunity" to respond to

15

fairness hearing for July 26, 2010. On June 9, 2010, the representative plaintiffs filed a joint motion for attorneys' fees in advance of the fairness hearing. In support of their motion, they attached the expert report of Dr. George Eads, an economist who placed the value of the settlement at over $142 million.

On June 11, 2010, objectors Daniel Sibley and George Stevens (the "Sibley Objectors") filed an objection to the settlement and a notice of intent to appear at the fairness hearing. The Sibley Objectors raised objections to the notice, the plan of allocation, and representative plaintiffs' fee petition. They did not at that time argue that the Magistrate Judge lacked jurisdiction over the case.

On June 14, 2010, the West Objectors, represented by the Center for Class Action Fairness, filed an objection to the settlement and a notice of intent to appear at the fairness hearing. The West Objectors raised several objections to the adequacy of representation, the presence of an intra-class conflict, the fairness of the settlement, and the requested attorneys' fee award.

In total, in a class consisting of approximately 5.5 million members, 203 class members objected to the

---

plaintiffs' papers, and that they simply failed to avail themselves of the opportunity. Fed. R. Civ. P. 23(h).

settlement or the fee petition.[6]  Additionally, 1,119 potential class members opted out of the class and the settlement.

## C.

Finally, on July 26, 2010, the District Court held a fairness hearing on the settlement agreement and the fee petition.  At the hearing, representative plaintiffs called Eads to testify about the value of the settlement.  Volkswagen did not cross-examine Eads, but the Magistrate Judge independently and thoroughly examined Eads about his methodology.  First, she asked about the "subcategories" in Eads's report—groups of class members who received different sets of notices based on their car models and the settlement benefits available to them.  She then asked Eads whether he divided the class into the subgroups, or whether he knew the basis for the divisions.  Eads responded that the lawyers had independently grouped the class members, and that he was not aware of the method they used.  He noted, however, that the grouping did seem to have some empirical basis grounded in the likelihood of experiencing leakage.  The Judge followed up by asking

---

[6] Notice was directed to the owners of over six million class vehicles.  Because many of these owners were "fleet buyers," and owned multiple class vehicles, the size of the class was appreciably lower than the size of the class vehicle pool.

whether Eads had determined why the residual group was excluded from seeking reimbursements.[7]  He responded that he did not know why the residual group was excluded, but said he assumed it was the product of negotiations between counsel.[8]

---

[7] The residual group was, in fact, allowed to make reimbursement claims.  They were simply restricted to making "goodwill" claims from the residual of the $8 million fund after the reimbursement group claims had been paid.  App'x A321.

[8] After the District Court completed its questioning, counsel for the West Objectors sought leave to cross-examine Eads.  The District Court declined to allow the West Objectors to cross-examine Eads, noting that they had failed to notify the parties of their intent to cross-examine Eads prior to the hearing, and that the court had already sufficiently questioned Eads.  The West Objectors argue on appeal that they were denied due process when the District Court failed to allow them to cross-examine Eads.

The West Objectors are correct that they have a limited right to discovery that can, in certain circumstances, include the opportunity to cross-examine witnesses before the court. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 316 (3d Cir. 2005); *see Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 833 (3d Cir. 1973) (noting that "an objector at a [fairness] hearing is entitled to an opportunity to develop a record in support of his

After Eads finished testifying, the court asked for argument from the objectors. Counsel for the West Objectors spoke first, raising several arguments as to why the proposed class failed to meet the requirements of Rule 23, and why the settlement should be rejected. After being pressed by the Magistrate Judge, counsel

---

contentions by means of cross-examination"). This right, however, is not absolute. Rather, "[t]he District Court has discretion to 'employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement.'" *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 563 (D.N.J. 1997), *aff'd* 148 F.3d 283 (3d Cir. 1998)). The extent to which the District Court's procedures limit the objectors' rights is "predicated on the total inadequacy of the record upon which the settlement was approved and the 'totality of the circumstances surrounding the settlement hearing' in which the objector was denied meaningful participation." *Id.* (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). We review for an abuse of discretion. *See id.* at 317.

In this case, the District Court did not abuse its discretion in concluding that the totality of the circumstances did not require further cross-examination at the fairness hearing. The Magistrate Judge had already thoroughly and effectively cross-examined Eads, and the court assured the West Objectors that they could substantively criticize Eads' methodology during their argument to the court.

stated that his primary argument was that there was "an *Amchem* problem"[9] in that "[c]lass members who are going to suffer damage in the future  . . .  are releasing their claims and have no relief under this settlement and they're not represented by any of the current class representatives because all of the class representatives have current claims, not future claims."  App'x A1102. In other words, counsel recast his earlier arguments in adequacy of representation terms under Rule 23(a)(4).

After the remaining objectors made their arguments, representative plaintiffs were given time for further argument.  Representative plaintiffs argued that the class members all suffer common problems with the drain systems that were "failing for the same reason." App'x A1108.  Representative plaintiffs also suggested that even if there were differences between class members, "we've dealt with this through subclasses for relief purposes."  App'x A1109.[10]  The Magistrate Judge

_____

[9] Counsel was referring to the Supreme Court's opinion in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1996).

[10] We find it remarkable that the parties continually referred to different subcategories of plaintiffs in the certified class as "subclasses."  At oral argument, Volkswagen characterized the parties' use of the term as an "unfortunate choice of language . . . used by the plaintiffs' expert."  Oral Arg. Tr. at 23:19-21.  We find the use of the term problematic.  The fact is that the

then allowed Volkswagen time for further argument. Volkswagen first argued that there was no adequacy problem, because "the Class representatives have the same interest as everyone else . . . ." App'x A1128-29. Volkswagen also pointed out that there were very few objectors and opt-outs, and argued that the small number implied that the settlement was fair.

D.

On August 3, 2010, the District Court issued an order certifying the class, approving the settlement, and granting representative plaintiffs' fee petition. The Magistrate Judge first addressed class certification, addressing each of the Rule 23 requirements. Notably, as to adequacy, the court found that there were no intra-class conflicts because "[t]he named plaintiffs are in the same position as the class members because each of them owned or leased the subject vehicles that contained the allegedly defective plenum or sunroof drain system, receiving allegedly inadequate maintenance recommendations and, as a result, suffered the same injury." App'x A82. The court further noted that "[t]he fact that the relief class members receive may differ

parties did not propose and the court did not certify separate subclasses. The use of the term is misleading, as actual subclasses may have mooted the adequacy issue raised in this very appeal. For purposes of this opinion we refer to the seven groups identified by Dr. Eads as "subcategories" rather than subclasses.

based upon the vehicle the member owned or leased does not reflect antagonism or differing interests. Rather, it reflects the compromise reached to address the frequency [with which] problems were reported for each model." App'x A83.

After concluding that the Rule 23 requirements were met, the court moved on to consider whether the settlement was fair and reasonable, pursuant to Rule 23(e). In analyzing the reasonableness of the settlement, the court considered the so-called *Girsh* factors:

> (1) the complexity, expense and likely duration of the litigation;
>
> (2) the reaction of the class to the settlement;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the risks of establishing liability;
>
> (5) the risks of establishing damages;
>
> (6) the risks of maintaining the class action through the trial;
>
> (7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). The court found that each of these factors either weighed in favor of the settlement, or was neutral.

In order to analyze the reaction of the class to the settlement, the second *Girsh* factor, the court considered the objections to the settlement. The court noted that:

Several objectors asserted that the division of class members into subclasses produced conflicts of interest which led to inequitable remedies. These divisions and the resulting remedies are based on objective criteria, namely the past frequency of failure and the design of the vehicles. This is a reasonable basis to decide the relief to be provided, particularly where complete, individualized relief for each class member could not be negotiated. All class members, even those in the subclass that receives only preventative care information, receive something of value. Thus, the division of class members into subclasses receiving

different benefits based upon the type of vehicle they own does not necessarily render the settlement unfair or unreasonable, nor does it show a conflict of interest that renders the class representatives unable to adequately represent the class.

App'x A102. Having concluded that the class met the requirements of Rule 23 and that the settlement was "fair and reasonable," the court certified the class and approved the settlement.

The court then considered the representative plaintiffs' petition for attorneys' fees and incentive awards. The court approved a fee award of $9.2 million, and approved a $10,000 incentive award for each representative plaintiff.

## II.

The West Objectors and the Sibley Objectors separately appeal from the District Court's order certifying the class, approving the settlement, and granting representative plaintiffs' fee petition. The West and Sibley Objectors raise a host of issues on appeal. Volkswagen and the representative plaintiffs also filed cross-appeals. Because we conclude that the District Court improperly certified the class, we limit our discussion to two issues: (1) whether the Magistrate Judge possessed, and consequently, whether this court possesses jurisdiction over this case absent the affirmative consent of the unnamed plaintiffs; and (2)

24

whether the class, as certified, satisfies the adequacy requirement of Rule 23(a)(4).

A.

The District Court had diversity jurisdiction over the case pursuant to the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d). A magistrate judge may exercise jurisdiction over a case in which a federal district court had jurisdiction "[u]pon the consent of the parties." 28 U.S.C. § 636(c)(1). Where the parties properly consent to allow the magistrate judge to exercise jurisdiction over the case, 28 U.S.C. § 636(c)(3) permits the parties to "appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge," as opposed to appealing to the district court that referred the case to the magistrate judge. "Accordingly, [this court's] final order jurisdiction to review such an order arises from 28 U.S.C. § 636(c)(3) to the extent it is final under 28 U.S.C. § 1291." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 200 n.7 (3d Cir. 2004).

The failure to satisfy the requirements of § 636(c)(1) deprives the magistrate judge of jurisdiction over the case. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 472 (6th Cir. 2006). Similarly, where the requirements of § 636(c)(1) are not satisfied, we lack jurisdiction under § 636(c)(3), and the parties must appeal directly to the district court that referred the case pursuant to the procedures outlined in 28 U.S.C. § 636(b)(1). *Cf. Skretvedt*, 372 F.3d at 200 n.7.

25

The Sibley Objectors argue that they, and other unnamed class members, are "parties" within the meaning of § 636(c)(1), and that their consent was required in order for the Magistrate Judge to exercise jurisdiction over the case. If the Magistrate Judge lacked jurisdiction over the case under § 636(c)(1), this court would lack jurisdiction pursuant to § 636(c)(3). Because this issue concerns our jurisdiction over this appeal, we address it even though the Sibley Objectors did not first raise the issue in their written objection filed with the District Court. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76-77 (3d Cir. 2003) (noting that jurisdiction is a non-waivable issue, and that "courts have an independent obligation to satisfy themselves of jurisdiction if it is in doubt"). We review the issue *de novo*. *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163-64 (3d Cir. 2010).

The Seventh Circuit rejected such an argument in *Williams v. General Electric Capital Auto Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998). *Williams* held that unnamed class members are not "parties" within the meaning of § 636(c)(1); rather, "they are more accurately regarded as having something less than full party status . . . ." *Id.* at 269. As a result, the court held that the affirmative consent of all unnamed class members is not required in order for a magistrate judge to exercise jurisdiction over a case. If an unnamed class member objects to trying the case before a magistrate judge, that class member has two options:

26

First, she may apply to the district court to intervene under Rule 24(a), become a party to the lawsuit, and then exercise her right to withhold her consent to proceed before the magistrate. Or, after the entry of final judgment, the unnamed class member can raise a collateral attack based on due process against the named representative's decision to consent under § 636(c). . . . Alternatively, the unnamed class member could try to show in a collateral attack that the decision to proceed before a magistrate judge was a matter on which there was a. . . significant intra-class conflict and that the notice the absentee received was inadequate to inform her of this conflict.[11]

*Id.* at 269-70. We agree with the Seventh Circuit that unnamed class members are not "parties" within the meaning of § 636(c)(1), and that their consent is not required for a magistrate judge to exercise jurisdiction over a case.

The Sibley Objectors argue that *Williams* was

---

[11] The Sibley Objectors do not raise any possible intra-class conflicts as concerns the decision to proceed before the Magistrate Judge. The only intra-class conflicts that they raise concern the interests and incentives of representative plaintiffs in the process of negotiating the settlement agreement.

implicitly overruled by *Devlin v. Scardelletti*, 536 U.S. 1 (2002).  In *Devlin*, the Supreme Court held that unnamed class members are parties "for the purposes of bringing an appeal[.]"  *Id.* at 9.  *Devlin* did not consider § 636(c)(1), and in no way disturbed the reasoning in *Williams*.  Indeed, the *Devlin* court carefully limited its holding, noting that "[un]named class members . . . may be parties for some purposes and not for others."  *Id.* at 9-10.  The Supreme Court specifically stated that its holding did not "conflict with any other aspect of class action procedure."  *Id.* at 9.  The fact that unnamed class members may be parties for the purposes of bringing an appeal does not mean that they are, *ipso facto*, parties within the meaning of § 636(c)(1).  As the *Williams* court noted, such a "radical result" would "virtually eliminate § 636(c) referrals to magistrate judges in all potential class actions, because it would *de facto* transform all such cases into 'opt-in' style actions . . . ."  *Williams*, 159 F.3d at 269.  Consequently, we conclude that the Magistrate Judge properly exercised jurisdiction over this case.

## B.

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties [in a class action] . . . fairly and adequately protect the interests of the class."[12]

---

[12] A similar requirement is found in the Due Process Clauses of the Fifth and Fourteenth Amendments, which "of course require[ ] that the named plaintiff[s] at all

The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005) [hereinafter "*Community Bank I*"].[13]  The West Objectors question only the second component, arguing that two separate intra-class conflicts prevent the representative plaintiffs from adequately representing the entire class.

We review the District Court's order certifying the class for an abuse of discretion. *See In re DVI, Inc. Sec.*

---

times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).  The West Objectors do not phrase their argument in constitutional terms, and even if they did, it is unclear what differences, if any, exist between the adequacy requirement under the Due Process Clause and under Rule 23. *See* Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1676 (2008).

[13] "Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . . . those questions have, since 2003, been governed by Rule 23(g)." *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010).  Because the parties do not dispute the adequacy of class counsel, we consider the adequacy requirement strictly through the lens of Rule 23(a)(4).

*Litig.*, 639 F.3d 623, 629 n.7 (3d Cir. 2011). Similarly, "'[w]here the district court has declined to certify a subclass' and treats all class members as falling within a single class for purposes of a fund allocation, 'we will ordinarily defer to its decision unless it constituted an abuse of discretion.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 326 (3d Cir. 2011) (en banc) (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009)). An abuse of discretion "occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. [W]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2009) (citations and internal quotation marks omitted).

1.

The Supreme Court has twice considered this component of the adequacy requirement, first in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1996), and second in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1997). In *Amchem*, plaintiffs brought suit against defendant manufacturers of asbestos products. The parties reached an agreement to settle the case, then sought certification from the district court of a settlement class. Under the terms of the global settlement, the benefits received varied significantly from class member to class member. While some members could receive as

much as $200,000, others received nothing. The District Court approved the settlement and certified the class.

This court reversed, concluding that "serious intra-class conflicts preclude[d] th[e] class from meeting the adequacy of representation requirement." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996). We acknowledged that all parties had an incentive to maximize their recovery, but noted that "the settlement does more than simply provide a general recovery fund[,] [r]ather, it makes important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." *Id.*

Our opinion focused on the conflict between class members who already manifested injuries and those who had not yet manifested injuries. We recognized that class members without manifest injuries would "want protection against inflation for distant recoveries[,] . . . sturdy back-end opt-out rights and 'causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993.'" *Amchem*, 521 U.S. at 610-11 (quoting *Georgine*, 83 F.3d at 630-31). These incentives contrasted with the incentives of class members with manifest injuries, who "would care little about such provisions and would rationally trade them for higher current payouts." *Id.* at 611.

The Supreme Court affirmed, stating that "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover

conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. The court agreed that "the interests of those within the single class are not aligned," and suggested that the problem might be solved if the class members were divided into "discrete subclasses." *Id.* at 626.

The Supreme Court revisited the issue two terms later in *Ortiz*, 527 U.S. at 855-59. *Ortiz* also concerned a settlement in a class action suit against an asbestos manufacturer. The Fifth Circuit approved a settlement that excluded a number of potential class members with claims indistinguishable from the claims of the members of the settlement class, and provided the same benefit for all class members regardless of the strength of their claims.

The Supreme Court reversed on adequacy grounds. *Id.* The Court cited two specific intra-class conflicts that rendered the named plaintiffs inadequate class representatives. First, it noted that under *Amchem*, present and future claimants have different incentives in negotiating a settlement, and that present claimants cannot adequately represent future claimants. *Id.* at 856-57. Second, it noted that the class included plaintiffs exposed both before and after the defendant's insurance policy had expired. *Id.* at 857-58. Because the pre-expiration claimants had access to insurance proceeds, they had access to a bigger pool of money from which to recover. Post-expiration claimants lacked the incentive to seriously pursue reimbursement under the relevant

insurance policies because they could not benefit from such proceeds.

The Court again explicitly rejected the argument that the class members all had the same incentive simply because all members of the class wished for a maximum recovery. *Id.* Rather, the Court concluded that the intra-class conflicts prevented the representative plaintiffs from adequately representing the entire class. The Court reiterated that the adequacy issue could be avoided by dividing the class "into homogeneous subclasses[.]" *Id.* at 856. Further, the Court suggested that subclassing may be necessary when a class can be divided into "easily identifiable categories." *Id.* at 832.

Since *Ortiz*, this Court has confronted the adequacy requirement on several occasions. We have recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class. *See Community Bank I*, 418 F.3d at 307 ("[W]e recognize that 'adequate representation of a particular claim is determined by the alignment of interests of class members . . . .'" (quoting *Wal-Mart Stores, Inc. v. Visa USA Inc.*, 396 F.3d 96, 113 (2d Cir. 2005))); *Sullivan*, 667 F.3d at 336 n.5 (Scirica, J., concurring) (noting that subclasses were not needed because "all indirect class members have aligned interests"); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009) (noting that adequacy focuses on "alignment of interests"); *In re Gen. Motors Corp. Pick-Up Truck Fuel*

*Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (requiring that "the class representatives have interests that are sufficiently aligned with the absentees to assure that the monitoring serves the interests of the class as a whole"); *see also* Richard A. Nagareda, *Administering Adequacy in Class Representation*, 82 Tex. L. Rev. 287, 290 (2003) ("Dutifully following . . . the text of Rule 23(a)(4), current law focuses largely on aligning the 'interests' of the persons within the class. The idea is that the 'representative parties' will 'fairly and adequately protect' those interests and, in so doing, legitimately bind absent class members to the resulting judgment."). Certain intra-class conflicts may cause the interests of the representative plaintiffs to diverge from those of the unnamed class members. The adequacy requirement "is designed to ferret out" such conflicts of interest, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001), *superseded by statute on other grounds, as recognized in Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir. 2010), "and to ensure that the putative named plaintiff has the . . . incentive to represent the claims of the class vigorously." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 290 (3d Cir. 2010) [hereinafter "*Community Bank II*"].

Obviously, not all intra-class conflicts will defeat the adequacy requirement. *See* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law & Practice* § 4:30 (8th ed. 2011) ("Not all allegations of conflict will make a proposed representative inadequate."); *cf. In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 344 (3d Cir.

34

2010). "The hard question concerning intraclass conflicts asks which conflicts should matter . . . what divisions should render the class representation so defective in structure as to rise to the level of a constitutional dereliction," or violation of Rule 23(a)(4). Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1678 (2008). A "conflict must be 'fundamental' to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011); *see also Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." (internal quotation marks omitted)); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) ("An absence of *material* conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy . . . ." (emphasis added)); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification:  the conflict must be a 'fundamental' one going to the specific issues in controversy."); 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:26 (4th ed. 2002) (stating that for a conflict to render representative plaintiffs inadequate under Rule 23(a), the conflict "must be fundamental"); *cf. Community Bank II*, 622 F.3d at 303 ("Here, there is an obvious and fundamental intra-class conflict of interest . . . .").

"A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co.*, 350 F.3d at 1189. A conflict is fundamental where it touches "the specific issues in controversy." Conte & Newberg, *supra*, § 3:26; *see also Valley Drug Co.*, 350 F.3d at 1189; McLaughlin, *supra*, § 4:30. A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate. *See Ortiz*, 527 U.S. at 857; *Amchem*, 521 U.S. at 626-27. A conflict that is unduly speculative, however, is generally not fundamental. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009) (finding the adequacy requirement satisfied because "[a]t this stage in the litigation, the existence of such conflicts is hypothetical."); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 171 (2d Cir. 2001); McLaughlin, *supra*, § 4:30.

We must thus address two questions: (1) whether an intra-class conflict exists; and if so, (2) whether that conflict is "fundamental." We answer these questions by independently considering the two intra-class conflicts cited by the West Objectors to determine whether either conflict causes a divergence of interests significant enough to undercut the representative plaintiffs' ability to adequately represent the class.

2.

First, the West Objectors argue that there is an

36

intra-class conflict between those class members who have already suffered leakage, and those who have not yet suffered leakage. All of the representative plaintiffs fall into the former category. The West Objectors argue that this presents a classic *Amchem* conflict between "past" claimants (those who have already suffered damage) and "future" claimants (those who have not yet suffered damage).

More specifically, the West Objectors argue that representative plaintiffs had an incentive to prioritize recovery for leakage-related damage that they sustained over recovery for the failure to inform that was suffered by the entire class. The Supreme Court specifically cited a similar divergence of interests in *Amchem*, agreeing with this court's opinion below that "[a]lready injured parties . . . would care little about [benefits that may be important to future claimants] and would rationally trade them for higher current payouts." *Amchem*, 521 U.S. at 611. To properly analyze the intra-class conflict alleged here, we must look to the class as certified as well as to the terms of the settlement agreement. *Id.* at 627. An intra-class conflict will not necessarily prevent certification if the settlement agreement contains sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict. *Id.*

This case bears some resemblance to *Amchem* and raises some of the same concerns. As in *Amchem*, there are members of the putative class who are interested in

37

recovering immediate compensation for existing injuries they sustained as a result of the defendant's conduct, and other members who are primarily concerned with securing an adequate inflation-protected fund to provide compensation for future injury caused by the allegedly defective drain systems. However, the West Objectors fail to recognize a critical distinction between the representative plaintiffs here and the representative plaintiffs in *Amchem*. The problem with the representative plaintiffs in *Amchem* was that they "would care little" for benefits that would have been valuable to other members of the class. This is because once a class member manifested symptoms of asbestos-related injuries, that class member would be solely concerned with obtaining a "generous immediate payment[ ]" for the injury, not securing an "ample, inflation-protected fund for the future." *Amchem*, 521 U.S. at 626. This resulted in a misalignment of interests—certain members of the class had an incentive to pursue protections for future claims, while the representative plaintiffs lacked any such an incentive.

Here, on the other hand, the alignment of interests is not so starkly problematic. A class member who has already suffered leakage, and is thus a "past" claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims.[14] As such, past claimants also have an

_____

[14] The Settlement Agreement does distinguish between leakage that occurs before notice is sent out, and leakage

incentive to protect the ability of class members to make claims for future damage. Moreover, the settlement is structured to ensure that even past claimants have an incentive to protect the rights of all members of the class to make future claims, and thus to align the interests of the representative plaintiffs with those of the class. As the District Court recognized, the representative plaintiffs have "an interest in obtaining redress for future damage or avoiding future damage caused by the allegedly defective systems" that aligns with the interests of the other members of the class. App'x A83. Thus, although this case raises some of the same concerns that caused the Supreme Court to invalidate the settlement in *Amchem*, the misalignment of interests here is somewhat different than the misalignment of interests in *Amchem*.

The West Objectors' argument is not focused on the alignment of these interests, but rather on their magnitude. That is, the West Objectors worry that because the representative plaintiffs can seek damages for their past leakage, which makes up the vast majority

---

that occurs afterwards. The former is a "reimbursable repair" that is eligible for immediate reimbursement, while the latter is restricted to goodwill claims out of the residual fund. The West Objectors have not alleged that this distinction gives rise to an intra-class conflict. Moreover, to the extent that any such conflict exists, it is indistinguishable from the conflict between the reimbursement group and the residual group, which we discuss in Part III.B.3, *infra*.

of their damages, they will likely value future protections less than class members with no leakage-related damages. We reject this argument for two reasons.

First, it is unduly speculative. The "terms of the settlement [and] the structure of the negotiations" incentivized representative plaintiffs to seriously pursue protections for future claimants. *See Amchem*, 521 U.S. at 627. Nothing in the record suggests that representative plaintiffs had reason to ignore this incentive. We cannot conclude that the District Court abused its discretion simply based on speculation about whether the structural incentives created by the settlement sufficiently motivated the representative plaintiffs to represent the rest of the class. *See Kohen*, 571 F.3d at 680 (declining to find an adequacy problem on the basis of a speculative conflict); *Robinson*, 267 F.3d at 171 (same); McLaughlin, *supra*, § 4:30.

Second, even if the representative plaintiffs did value protections for future claimants less than other members of the class, we do not believe that, again on this record, their differing valuations would create a fundamental conflict sufficient to undermine their ability to adequately represent the class. *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012) ("Although significant conflicts make a plaintiff an inadequate class representative, differently weighted interests are not detrimental . . . [b]ecause few people are ever identically situated . . . ."). The West Objectors' argument—that representative plaintiffs derive less utility

40

from protections for future claims than those who have only future claims—cannot create, at least on these facts, a fundamental intra-class conflict sufficient to undermine Rule 23(a)(4).

As the Sixth Circuit observed in *Gooch*, each class member naturally derives different amounts of utility from any class-wide settlement. *Id.* An older or even a particularly myopic representative plaintiff, for example, might value a front-loaded settlement more than other members of the class. A coupon-clipping representative plaintiff may derive more utility from a coupon-based settlement than other members of the class. To hold that these differing valuations by themselves render the representative plaintiff inadequate would all but eviscerate the class action device. Of course, such differing valuations may be relevant to the ultimate determination whether the settlement is fair and reasonable. *See Girsh*, 521 F.2d at 157. We do not think, however, that the difference in valuation here is sufficient to call into question representative plaintiffs' ability to adequately represent the class.

3.

The West Objectors argue that there is an intra-class conflict between plaintiffs in the reimbursement group and plaintiffs in the residual group. Because all representative plaintiffs are in the reimbursement group, the West Objectors argue, they cannot adequately

represent class members in the residual group.[15]   We

---

[15] Members of the reimbursement group that made out-of-pocket payments for non-reimbursable repairs were also eligible to submit claims for reimbursement from the residual fund.  This does suggest that the representative plaintiffs had some incentive to maximize the residual that would likely be available to the residual class.  This incentive does not, however, resolve the adequacy issue raised by the West Objectors.   The representative plaintiffs' incentive to maximize the aggregate size of the reimbursement fund is separate from their interests in allocating that fund amongst the class.  The fundamental intra-class conflict here is allocative in nature, *see Amchem*, 521 U.S. at 626-27, and concerns the representative plaintiffs' incentive to shift the dividing line between the residual and reimbursement groups in order to maximize their own recovery, at the expense of other members of the class who lacked a representative to protect their interests.   Even if the reimbursement group managed to negotiate a reimbursement fund that was expected to satisfy the claims of the residual group, there remained a chance, however remote, that the fund would not be sufficiently large.  This risk of loss from any shortfall lay primarily with the residual group.  As such, even if the reimbursement group had an incentive to negotiate for a fund large enough to satisfy the required residual claims, the potential risk of loss from any shortfall would still create a problematic incentive to carve out as many class members from the

agree.

The structure of the settlement agreement itself, which divides a single class into two groups of plaintiffs that receive different benefits, supports the inference that the representative plaintiffs are inadequate. The reimbursement group has priority access to the $8 million fund. Only after their claims are satisfied can the administrator satisfy goodwill claims from the residual group. In order to sort the plaintiffs into these two groups, representative plaintiffs sorted the various car model runs[16] by their claims rates. On this spectrum of claims rates, representative plaintiffs drew a line delineating the boundaries between the two groups. Those model runs with claims rates above the line were placed in the reimbursement group. Those model runs with a claims rate below the line were placed in the residual group.[17] It was this line-drawing exercise that

reimbursement group as possible. This incentive gives rise to an adequacy problem.

[16] Each car included in the class could be sorted into a car model "run" which included other cars using the same vehicle platform. App'x A1188-89.

[17] There appears to be some dispute over whether or not the assignment of individual plaintiffs was actually based, as representative plaintiffs allege, on the relevant claims rates. The West Objectors note several outlier car models in the residual group with higher claims rates

exacerbated the adequacy problem here.

Every plaintiff in the class had an incentive to maximize the number of plaintiffs in the residual group, while ensuring that they themselves were in the reimbursement group. That is, every plaintiff had an incentive to draw the dividing line just beneath their model run, placing as many cars as possible into the residual group. Doing so would create the least amount of competition for the first round of reimbursement claims, and would thus give class members in the reimbursement group the best chance at having their claims satisfied in full.

The problem is that the interests of the representative plaintiffs and the interests of the residual group aligned in opposing directions. Representative plaintiffs had an incentive to draw the line just beneath their model runs, and to relegate everyone below the line to the residual group. Class members in the residual group had an incentive to lower the line just below their model run such that they were included in the reimbursement group but everyone below the line remained in the residual group. Put simply, representative plaintiffs had an interest in excluding other

than certain models in the reimbursement group. We need not address this issue because we conclude that even if representative plaintiffs did assign cars into the various groups based on claims rates, they still could not adequately represent the class.

plaintiffs from the reimbursement group, while plaintiffs in the residual group had an interest in being included in the reimbursement group. This is precisely the type of allocative conflict of interest that exacerbated the misalignment of interests in *Amchem*, 521 U.S. at 626-27.

Volkswagen defends the adequacy of the named representatives by pointing to our decision in *In re Insurance Brokerage Antitrust Litigation*, 579 F.3d 241, 271-72 (3d Cir. 2009). In that case, we approved a settlement in which different members of a single class received different recoveries, but where no subclasses were certified. The settlement agreement there calibrated the amount of recovery based on the type of insurance policy held by the plaintiff, providing that those class members who held excess insurance policies received a larger recovery than those who held other types of insurance policies. We held that this allocation "is simply a reflection of the extent of the injury that certain class members incurred and does not clearly suggest that the class members had antagonistic interests." *Id.* at 272. We affirmed because we found that subclasses were not necessary.

That opinion, however, did not address the ability of the representative plaintiffs to adequately represent the class. *Insurance Brokerage* did not cite Rule 23(a)(4) and cited neither *Amchem* nor *Ortiz* in its discussion of whether subclasses were necessary. It did not discuss the interests or incentives of the named plaintiffs in the suit.

Rather, it applied typicality and commonality principles, discussing the similarity between the claims brought by all class members, regardless of the type of insurance policy held. Absent any discussion of misaligned incentives or intra-class conflict, *Insurance Brokerage* cannot govern our inquiry in this case.

Plaintiffs also argue that there is no fundamental intra-class conflict here because the subcategories were drawn up based on empirical data—i.e., the claims rates amongst the various model runs. As a result, they argue, the groups were divided based on empirical data, and the incentives of the representative plaintiffs had no effect. In support of their argument, they point to Eads's testimony at the fairness hearing suggesting that the model runs in the reimbursement group had higher claims rates than those in the residual group. Fairness Hearing Tr. 35:13-36:12.

Any dividing line on the spectrum of claims rates, however, would produce the same result—those above the line would, in general, have higher claims rates than those below the line. The problem with dividing the class without having any representation from one of the groups becomes clearly untenable in this case because of who drew the line. Eads plainly stated that the line "was decided by the lawyers."[18] *Id.* at 35:13. However, the

---

[18] The West Objectors argue that the District Court should have excluded Eads' testimony entirely, pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579

representative plaintiffs and their counsel could not adequately represent the entire class in determining where the line would lie, because the settlement provided "no structural assurance" that the class representatives—all of whom were in the reimbursement group and had already suffered leakage—could adequately represent the interests of the class members in the residual group. *Amchem*, 521 U.S. at 627. Thus, on these facts, there is a fundamental intra-class conflict between the representative plaintiffs, all of whom are in the

---

(1993). Under *Daubert*, a District Court must review an expert's testimony to determine whether it may proceed to the factfinder. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008). *Daubert* is not an all-or-nothing test, however—a District Court can independently consider whether each "particular scientific [or technical] methodology is reliable." *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (internal quotation marks omitted) (discretely analyzing an expert's various opinions under the lens of *Daubert*). That is precisely what the Magistrate Judge did, engaging in a painstaking analysis of Eads' report, proceeding line-by-line through his calculations, and omitting or adjusting calculations that were inflated or based on unreliable methods or assumptions. The District Court did not abuse its discretion in declining to exclude Eads' testimony in its entirety. *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (reviewing a District Court's decision to admit expert testimony for an abuse of discretion).

reimbursement group, and those plaintiffs in the residual group. We will reverse the District Court's order certifying the class because the representative plaintiffs fail to satisfy the adequacy requirement in Rule 23(a)(4).

We see two ways by which the representative plaintiffs may satisfy Rule 23(a)(4) on remand. First, they can simply do away with the distinction between the reimbursement group and the residual group, and allow all members of the class to submit reimbursements with no difference in priority. Without any need to draw a line between themselves and other members of the class, representative plaintiffs' interest in maximizing their own returns would align with the interests of the rest of the class. Practically speaking, this does not appear to be a problem in this case. Representative plaintiffs project that the $8 million reimbursement fund will be sufficient to satisfy the claims of those in the reimbursement group and the residual group, if projected claim rates hold true.[19] As such, there appears to be no need to create a

---

[19] Volkswagen appears to suggest that the fact that the residual is likely sufficient to satisfy the claims arising out of the residual group implies that the representative plaintiffs adequately represented the class. Such an argument was made in *Amchem*, and was explicitly rejected by the Supreme Court. *Amchem*, 521 U.S. at 626 ("The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to

residual group.

Second, the parties could simply divide the groups into subclasses that would be certified separately. The Supreme Court has held that subclassing can resolve conflicts of interest that might prevent representative plaintiffs from adequately representing the class. *See Ortiz*, 527 U.S. at 856 (holding that an intra-class conflict "require[d] division into homogeneous subclasses . . . with separate representation to eliminate conflicting interests"); Conte & Newberg, *supra*, § 3:32 (discussing the use of subclasses to address "competing interests in distributing the monetary relief" available to the class). For example, the class might be divided into a reimbursement subclass and a residual subclass, each with representative plaintiffs to ensure that their interests are being accommodated.

What is clear at this stage, however, is that the class as certified fails to satisfy Rule 23(a)(4). Representative plaintiffs simply cannot adequately represent the interests of the entire class. Despite the exemplary manner in which the Magistrate Judge

---

pay claims under the settlement."). The adequacy requirement provides *structural* protections during the process of bargaining for settlement. The fact that the stars aligned and the class members' interests were not actually damaged does not permit representative plaintiffs to bypass structural requirements.

conducted the fairness hearing, and her painstaking efforts to adduce information not elicited by the parties during that hearing, we conclude that she abused her discretion in certifying the class. Accordingly, we will reverse the District Court's certification order.

## C.

The parties also raise a host of issues concerning the District Court's analysis of representative plaintiffs' fee petition. First and foremost, Volkswagen argues that the District Court erred in its choice-of-law analysis regarding the fee petition. Because our analysis of the fee petition would turn on the language of the choice-of-law provision in the settlement agreement, and because the parties will need to negotiate a new settlement agreement in light of our holding, we cannot decide these issues now.[20]

---

[20] We recognize that, as representative plaintiffs noted at oral argument, these issues may arise again and may necessitate another appeal. It is possible, however, that they will not arise in the same form as currently presented. The parties may choose to address these issues if they draft a new settlement agreement. As such, any decision now would be an impermissible advisory opinion. *See Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) ("[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." (internal quotation marks omitted)). We thus

50

## III.

Rule 23(a)(4) was designed to ensure that the representative plaintiffs in a class action suit adequately represent the interests of the entire class. The structure of the settlement here provides no such assurances. We conclude that representative plaintiffs cannot adequately represent the interests of the members of the class in the residual group. We will reverse the District Court's certification order, and will remand for further proceedings.

---

decline representative plaintiffs' invitation to decide the issues arising out of their fee petition.