PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4273
_____

IN RE: COMMUNITY BANK OF NORTHERN VIRGINA
MORTGAGE LENDING PRACTICES LITIGATION

PNC Bank NA, successor to CBNV,
                                        Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-03-cv-00425)
District Judge:  Hon. Arthur J. Schwab
_____

Argued January 20, 2015

Before:   FISHER, JORDAN, and GREENAWAY, JR.,
              *Circuit Judges*.

(Filed: July 29, 2015)
_____

Martin C. Bryce, Jr., Esq.  [ARGUED]
Joel E. Tasca, Esq.
Ballard Spahr
1735 Market St.
51st Floor
Philadelphia, PA 19103
        *Counsel for Appellant*

Scott C. Borison, Esq.
Legg Law Firm
5550 Buckeystown Pike
Frederick, MD 21703

R. Bruce Carlson, Esq.   [ARGUED]
Gary F. Lynch, Esq.
Carlson Lynch Sweet & Kipela
115 Federal St.
Suite 210
Pittsburgh, PA 15122


Daniel O. Myers, Esq.
100 Park St.
Traverse City, MI 49684

David M. Skeens, Esq.
Roy F. Walters, Esq.   [ARGUED]
Walters, Bender, Strohbehn & Vaughan
1100 Main St.
Suite 2500
P.O. Box 26188
Kansas City, MO 64196


Robert S. Wood, Esq.
Richardson, Patrick, Westbrook & Brickman
1037 Chuck Dawley Boulevard
Building A
Mount Pleasant, SC 29464
     *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

TABLE OF CONTENTS

Page

I.    Background. . . . . . . . . . . . . . . . . . . . . . . . .    6

      A.    The Alleged Illegal Lending Scheme . .    7

      B.    *Community Bank I*. . . . . . . . . . . . . . . .    10

      C.    *Community Bank II* . . . . . . . . . . . . . . .    13

      D.    Post-*Community Bank II* Proceedings. .    17

II.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . .    21

      A.    Adequacy of Representation . . . . . . . . .    23

      B.    Conditional Certification. . . . . . . . . . . .    30

      C.    Other Rule 23 Requirements. . . . . . . . .    31

            1.    Ascertainability . . . . . . . . . . . . .    31

            2.    Commonality. . . . . . . . . . . . . .    34

            3.    Predominance . . . . . . . . . . . . . .    38

                  a.    Standing . . . . . . . . . . . . .    40
                  b.    Equitable Tolling . . . . . .    40

                        i.    Active Misleading    43

ii.    Reasonable Due Diligence . . . . . . .   47

c.    RESPA Claims . . . . . . . .   51

d.    TILA/HOEPA Claims. . .   54

e.    RICO Claims  . . . . . . . . .   57

4.    Superiority . . . . . . . . . . . . . . . .   59

5.    Manageability  . . . . . . . . . . . . . .   61

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

JORDAN, *Circuit Judge*.

PNC Bank, N.A. ("PNC") challenges an order of the United States District Court for the Western District of Pennsylvania certifying a nationwide litigation class of individuals who received residential mortgage loans from Community Bank of Northern Virginia ("CBNV"), a financial institution whose interests were later acquired by PNC. The appeal presents several arguments against certification. First, PNC contends that there is a fundamental class conflict that undermines the adequacy of representation provided by class counsel. Second, PNC claims that the District Court conditionally certified the class and thus erred. Third, PNC says that the putative class does not meet the ascertainability, commonality, predominance, superiority, or manageability requirements of Rule 23 of the Federal Rules of Civil Procedure. We have considered each of those arguments and a number of subsidiary ones and find them unpersuasive. We will therefore affirm.

## I.    Background

This is the third appeal from the certification of a class based on allegations of an illegal home equity lending scheme involving two banks, specifically CBNV and Guaranty National Bank of Tallahassee ("Guaranty"), and also involving GMAC-Residential Funding Corporation n/k/a Residential Funding Corporation, LLC ("Residential Funding"), a company that purchased mortgage loans from those banks. *See In re Cmty. Bank of N. Va.* (*Community Bank I*), 418 F.3d 277 (3d Cir. 2005); *In re Cmty. Bank of N. Va.* (*Community Bank II*), 622 F.3d 275 (3d Cir. 2010). The

two previous appeals involved certification of settlement classes, but this appeal involves certification of a litigation class. Much of the factual and procedural history of this case is set out in detail in our two prior opinions, but we reiterate the relevant portions here.

## A.  The Alleged Illegal Lending Scheme

The Plaintiffs describe a predatory lending scheme affecting numerous borrowers nationwide and allegedly masterminded by the Shumway Organization ("Shumway"), a residential mortgage loan business operating in Chantilly, Virginia. Through a variety of entities, including EquityPlus Financial, Inc. ("Equity Plus"), Equity Guaranty, LLC ("Equity Guaranty"), and various title companies, Shumway offered high-interest mortgage-backed loans to financially strapped homeowners.

As a non-depository lender, Shumway was subject to fee caps and interest ceilings imposed by various state mortgage lending laws. The Plaintiffs aver that, in an effort to circumvent those limitations, Shumway formed associations with several banks, including CBNV and Guaranty. Shumway allegedly arranged payments to CBNV and Guaranty to disguise the source of its loan origination services so that fees for those services would appear to be paid solely to the banks, which were depository institutions. The Plaintiffs allege that, in reality, the overwhelming majority of fees and other charges associated with the loans were funneled through the two banks to Shumway via Equity Plus (in the case of loans made by CBNV) and Equity Guaranty (in the case of loans made by Guaranty). After Virginia banking regulators expressed concern to CBNV

7

regarding the legality of the arrangement, the deal between CBNV and Equity Plus was allegedly restructured in October 1998 so that Equity Plus became a "consultant" to CBNV that provided no settlement services yet still received the lion's share of fees paid in exchange for those services.

The Plaintiffs allege that CBNV and Guaranty uniformly misrepresented the apportionment and distribution of settlement and title fees on their HUD–1 Settlement Statement forms.[1] The Plaintiffs further allege that the fees listed on the HUD–1s included illegal kickbacks to Shumway and did not reflect the value of any services actually performed.

According to the Plaintiffs, Residential Funding derived a significant portion of its business from the securitization of "jumbo" mortgages[2] and especially High-Loan-to-Value loans.[3] The Plaintiffs allege that Residential Funding purchased a majority and perhaps all of the loans

---

[1] A HUD–1 is a standard real estate settlement form that the Real Estate Settlement Procedures Act requires in connection with all mortgage loans that are covered by federal law. 12 U.S.C. § 2603.

[2] A jumbo mortgage is a home loan with an amount that exceeds the conforming loan limits imposed by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association, the two government-sponsored enterprises that buy mortgages from lenders.

[3] Loans where the amount financed represent up to 125% of the value of the securitized collateral are called High-Loan-to-Value loans.

originated by CBNV and Guaranty, despite knowing that those entities passed most of the origination and title service fees to Shumway. Because Residential Funding derived substantial income from the settlement fees, the Plaintiffs allege that it ignored unlawful settlement practices and actively worked with CBNV and Guaranty to expand the loan volume generated by the scheme.

In the early 2000s, a number of putative class actions arising out of the alleged Shumway scheme were filed by various plaintiffs (the "Original Plaintiffs") and were eventually consolidated in the United States District Court for the Western District of Pennsylvania.[4] The Original Plaintiffs asserted claims arising under the Real Estate Settlement Procedures Act ("RESPA"),[5] the Racketeer Influenced and

---

[4] In all, six putative class actions were consolidated on July 18, 2003. We provided a detailed outline of the separate class actions and the consolidation process in *Community Bank I*. 418 F.3d at 284-87.

[5] Congress enacted RESPA in 1974 in response to abusive loan practices that inflated the cost of real estate transactions. 12 U.S.C. § 2601(a). Section 8 of RESPA prohibits kickbacks and unearned fees, and it may be enforced criminally or civilly. *Id*. §§ 2607, 2614. More specifically, section 8(b) of RESPA prohibits the giving or receiving of "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service … other than for services actually performed." *Id*. § 2607(b). Civil actions under that section must be brought within one year of the alleged violation. *Id*. § 2614.

Corrupt Organizations Act ("RICO"),[6] and Pennsylvania law. The putative class consisted of approximately 44,000 borrowers.

## B. *Community Bank I*

On July 14, 2003, the Original Plaintiffs and certain defendants, including CBNV, Guaranty, and Residential Funding, proposed a nationwide class action settlement, which was approved by the District Court. Under the terms of the settlement, the maximum total payout to the approximately 44,000 member class was $33 million. The settlement payouts ranged from $250 to $925 per borrower depending on the borrower's residence and the date on which the loan was entered. In exchange, the borrowers were to release any and all state or federal claims that they might have relating to the mortgage loans at issue, including the right to use a violation of federal or state law as a defense to any foreclosure action. Because CBNV supported the settlement,

---

[6] RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Any person injured in his business or property by reason of a violation of section 1962 … may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *Id*. § 1964(c).

it did not contest the requirements for class certification.[7] The order approving the settlement was appealed by a group of plaintiffs (the "Objector Plaintiffs") who argued that claims under the Truth in Lending Act ("TILA")[8] and the

[7] Defendants may engage in settlement negotiations and become parties to a class action settlement agreement without giving up the ability to contest class certification requirements later should the settlement fall apart. *In re Gen. Motor Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir. 1995).

[8] "TILA is a federal consumer protection statute[] intended to promote the informed use of credit by requiring certain uniform disclosures from creditors." *Community Bank I*, 418 F.3d at 303. "Among other things, creditors who make loans secured by a borrower's principal dwelling are required to provide all borrowers with 'material disclosures,' including 'the annual percentage rate, the finance charge, the amount financed, the total payments, [and] the payment schedule.'" *Id*. at 304 (quoting 12 C.F.R. § 226.23) (alteration in original) (footnote omitted). "If 'material disclosures' are not provided or inaccurately provided, the creditor is strictly liable and a borrower has the right to rescind the loan up to '3 years after consummation, upon transfer of all of the consumer's interest in the property, [or] upon sale of the property, whichever occurs first.'" *Id*. (quoting 12 C.F.R. § 226.23) (alteration in original) (footnote omitted). "In addition to the right of rescission, an aggrieved borrower may, within one year of the date of the violation, seek 'actual damage[s] sustained … as a result of the failure,' and statutory damages, which cannot exceed $500,000 or one percent of the creditor's net worth (whichever is less) in the case of a class action." *Id*. (quoting 15 U.S.C.

Home Ownership and Equity Protection Act ("HOEPA")[9] should also have been asserted on behalf of the putative class.

---

§ 1640(a)(1),(2)(B)) (alteration in original) (footnote omitted).

[9] "HOEPA, enacted as an amendment to TILA, creates a special class of regulated loans that are made at higher interest rates or with excessive costs and fees" than those regularly covered by TILA. *Community Bank I*, 418 F.3d at 304. HOEPA protections apply if a loan meets one of two high-cost loan triggers: (1) the annual percentage rate ("APR") exceeds by more than 6.5 percent or 8.5 percent, depending on the value of the transaction, the yield on Treasury securities having comparable periods of maturity for first-lien loans, or above ten percent for subordinate-lien loans; or (2) the total of all the loan's points and fees exceed eight percent of the loan total or $400 (adjusted for inflation), whichever is greater. 15 U.S.C. § 1602(bb)(1) & (3); 12 C.F.R. § 226.32(a)(1)(i), (ii).

Loans covered by HOEPA are not only subject to certain restrictions, but are also subject to special disclosure requirements. 15 U.S.C. § 1639. Within three business days prior to the consummation of a loan, a creditor is required to disclose to the borrower, *inter alia*, the APR of the loan and the amount of regular monthly payments. 15 U.S.C. § 1639(a)(2) & (b)(1). Failure to materially comply with such requirements entitles a borrower to "an amount equal to the sum of all finance charges and fees paid by the consumer." *Id*. § 1640(a)(4). An action for damages under HOEPA must be brought within one year of the violation, *id*. § 1640(e), and an action for rescission must be brought within three years, 12 C.F.R. § 226.23. *Community Bank II*, 622 F.3d at 283.

We vacated the order approving the settlement and remanded the case because, among other things, the District Court had not adequately analyzed the propriety of class certification under Federal Rule of Civil Procedure 23. *Community Bank I*, 418 F.3d at 300-02. We stated that various class certification requirements, which had not been disputed, were likely met, *id.* at 303 (suggesting "that the numerosity, typicality, and commonality prongs are met"), but we specifically directed the District Court to perform its own independent analysis, *id.* at 306 ("All of the above, of course, are issues to be considered by the District Court in its independent analysis."). In particular, we questioned whether the putative class representatives – whose claims were untimely under TILA/HOEPA without the benefit of equitable tolling – could adequately represent putative class members who had timely TILA/HOEPA claims. *Id.* at 306-07. To resolve that problem with the adequacy of representation, we suggested that the District Court "divid[e] the class into sub-classes." *Id.* at 307.

## C.     *Community Bank II*

On remand, the District Court approached its analysis in two steps. First, it addressed the viability of potential TILA/HOEPA claims. Second, it addressed adequacy of representation and other Rule 23 requirements. While the parties were briefing the viability issue, the Original Plaintiffs entered into new settlement negotiations with the defendants, which resulted in a new settlement agreement (the "Modified Settlement Agreement"). The Modified Settlement Agreement took the availability of TILA/HOEPA claims into account and increased the settlement amount for class members who were able to assert such claims.

13

The District Court then heard oral argument on the viability of potential TILA/HOEPA claims. In discussing the case, the Original Plaintiffs and the Objector Plaintiffs agreed with the District Court that a Rule 12(b)(6) standard should be used to determine the viability of potential TILA/HOEPA claims. The District Court's reasoning appeared to be that, if those claims could not survive a Rule 12(b)(6) motion to dismiss (and thus were not viable), neither the named plaintiffs nor their counsel could be faulted – on adequacy of representation grounds or otherwise – for failing to bring them. In October 2006, the District Court issued an order in which, purportedly applying a Rule 12(b)(6) standard,[10] it determined that the potential TILA/HOEPA claims were not viable. It concluded that "no class member could bring a timely claim under TILA or HOEPA for damages or rescission" because those claims would not relate back to any earlier complaint, and it also concluded that "no class member could rely on equitable tolling to save their otherwise time-barred claims." *Community Bank II*, 622 F.3d at 288.

---

[10] "Though the District Court purported to approach this question using a Rule 12(b)(6) standard, its analysis actually dealt with Rule 15(c), which governs the circumstances where an amended pleading 'relates back to the date of the original pleading.'" *Community Bank II*, 622 F.3d at 295 (quoting Fed. R. Civ. P. 15(c)). "The Court approached the relation-back question – *i.e.*, whether an amended pleading asserting TILA/HOEPA claims could relate back to any earlier complaint – not by reference to a hypothetical amended complaint that the existing named plaintiffs could file, but by reference to an amended complaint filed by absent members of the class." *Id*.

On December 1, 2006, the District Court informed the parties that it intended to appoint an "independent body" to evaluate the fairness of the Modified Settlement Agreement. *Id*. The Court later appointed Donald Ziegler, a retired Chief Judge of the United States District Court for the Western District of Pennsylvania, to provide a non-binding opinion as to whether the Modified Settlement Agreement was "fair and reasonable" under Rule 23. *Id*. Judge Ziegler heard arguments from the parties and issued an advisory opinion in which he concluded that the Modified Settlement Agreement was fair and reasonable. On August 14, 2008, the District Court issued an order adopting Judge Ziegler's recommendation. The Court certified the settlement class and approved the Modified Settlement Agreement.

The Objector Plaintiffs once more appealed, challenging both the District Court's certification order and its earlier ruling regarding the adequacy of representation. We again vacated the District Court's order, finding that the Court had erred in a number of ways. Without actually deciding the issue, we expressed doubts about the District Court's Rule 12(b)(6) analysis because, in our opinion, the Objector Plaintiffs had a "strong argument that their TILA/HOEPA claims" qualified for class action tolling. *Id*. at 300. We also stated that, "because the question [of] whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is generally not amenable to resolution on a Rule 12(b)(6) motion." *Id*. at 301-02. We went on to note that, in any event, the District Court's merits inquiries – *i.e.*, whether a new plaintiff could file an amended pleading asserting TILA/HOEPA claims or adequately plead a basis

15

for equitable tolling under Rule 12(b)(6) – "were unnecessary to evaluate the adequacy requirement." *Id*. at 303.

Looking at the adequacy requirement, we concluded, that the District Court had "incorrectly evaluated the adequacy of the named plaintiffs and class counsel." *Id*. We repeated that the adequacy requirement is designed "'to uncover conflicts of interest between named parties and the class they seek to represent.'" *Id*. (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). And we stated that there was an "obvious and fundamental intra-class conflict of interest," which was the same conflict of interest we had identified in *Community Bank I*. *Community Bank II*, 622 F.3d at 303. We were concerned that the class representatives' RESPA and TILA/HOEPA claims were untimely and required equitable tolling to be saved, but that they nevertheless sought to represent a "sizeable subgroup" of approximately 14,000 persons who had timely claims under each statute. *Id*. We directed the District Court to consider that intra-class conflict on remand and stated that "[t]he most obvious remedy would be to create subclasses." *Id*. at 304.

We also noted that, as to class counsel, the adequacy requirement assures that counsel possesses adequate experience, will vigorously prosecute the action, and will act at arm's length from the defendant. *Id*. at 304-05. "[M]ere disagreement," we said, "over litigation strategy … does not in and of itself, establish inadequacy of representation." *Id*. at 305 (internal quotation marks omitted) (alteration in original). "Were it otherwise, disagreements over strategy would require decertification any time an objection is raised to a class, certainly not the standard envisioned by Rule 23." *Id*. (internal quotation marks omitted). Looking to the particulars

16

presented in *Community Bank II*, we stated that, while "class counsel is not inadequate simply because they have not asserted every claim that could theoretically be pled against a defendant," class counsel's explanation for not asserting TILA/HOEPA claims on behalf of the class "deserve[d] more scrutiny" than the Court had given it. *Id*. at 305. Accordingly, we directed the District Court to examine the adequacy of class counsel more closely on remand. *Id*. at 314.

### D.     Post-*Community Bank II* Proceedings[11]

Following remand, the Original Plaintiffs abandoned settlement negotiations and joined forces with the Objector Plaintiffs, and on October 4, 2011, the Plaintiffs filed a Joint Consolidated Amended Complaint (the "Complaint") that now includes TILA/HOEPA claims, along with RESPA and RICO claims. The Complaint originally named as Defendants CBNV, the Federal Deposit Insurance Corporation ("FDIC") as the Receiver for Guaranty,[12] PNC

---

[11] On April 24, 2013, the judge who had presided in this case passed away. United States District Judge Arthur Schwab has presided over the case since May 16, 2013.

[12] On March 12, 2004, after this litigation began, the Comptroller of the Currency declared Guaranty to be unsafe and unsound, and appointed the FDIC as receiver. On March 29, 2004, the FDIC asked to be substituted for Guaranty as the true party in interest. That motion was granted.

17

Bank as Successor to CBNV,[13] and Residential Funding. Residential Funding subsequently filed a Notice of Bankruptcy and Effect of Automatic Stay, and all claims against it were stayed. The District Court also granted the FDIC's Motion to Dismiss for lack of subject matter jurisdiction.[14] As a result, the only active claims remaining before the District Court at the certification stage were those asserted against CBNV and its successor in interest, PNC.

On June 21, 2013, the Plaintiffs moved for certification of a general class and of five subclasses. The general class was defined as: "All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling, for the period May 1998-December 2002." (App. at 1271.) The five subclasses were defined as:

> Sub-Class 1: (RESPA [Affiliated Business Association] Disclosure Sub-Class) (Plaintiffs: Philip and Jeannie Kossler) – All persons nationwide who obtained a second or

---

[13] Mercantile Bankshares Corp. acquired CBNV in 2005. PNC acquired Mercantile Bankshares Corp. in 2007.

[14] The FDIC moved for dismissal pursuant to, among other legal authorities laid out in a 60-page brief, Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). The June 12, 2013 order dismissing the claims against the FDIC appears to grant the motion pursuant to Rule 12(b)(1), but the Court provided no explanation for its ruling.

subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-October 1998;

Sub-Class 2: (RESPA Kickback Sub-Class) (Plaintiffs: Brian and Carla Kessler; John and Rebecca Picard) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period October 1998-November 1999;

Sub-Class 3: (TILA/HOEPA Non-Equitable Tolling Sub-Class) (Plaintiffs: Kathy and John Nixon; Flora Gaskin; and, Tammy and David Wasem) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1, 2001-May 1, 2002;

Sub-Class 4: (TILA/HOEPA Equitable Tolling Sub-Class) (Plaintiffs: All [named] plaintiffs other than the Nixons, Gaskins and Wasems) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from

CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-December 2002;

Sub-Class 5: (RICO Sub-Class) (Plaintiffs: John and Rebecca Picard; Brian and Carla Kessler) – All persons nationwide who obtained a second or subordinate, residential, federally related, non purchase money, mortgage loan from CBNV that was secured by residential real property used by the Class Members as their principal dwelling for the period May 1998-November 1999.

(App. at 1271-1272.) The Plaintiffs requested that all named class representatives be appointed as representatives of the general class and that the designated class representatives be appointed as representatives of the requested subclasses. The Plaintiffs also requested that two law firms be appointed as co-lead counsel and that a handful of other lawyers and law firms be appointed as class counsel.

On July 31, 2013, the District Court granted class certification.[15] The Court's certification ruling relied heavily on our dicta in *Community Bank I* discussing the requirements of Rule 23, and it approved the general class and subclasses proposed by the Plaintiffs. The order did not make provision for separate counsel for the subclasses. In analyzing the

---

[15] As noted by the District Court, the Motion for Certification was silent as to any state law claims. As a result, no state law claims were certified for class treatment.

20

adequacy requirement, the District Court relied primarily on *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012), in which we stated that only "fundamental" intra-class conflicts will defeat the adequacy requirement. *Id*. at 183-84. Because the Original Plaintiffs and the Objector Plaintiffs each asserted TILA/HOEPA claims in the Complaint, the District Court concluded that there is no fundamental conflict between the subclasses. PNC has now appealed the class certification order.[16]

## II.    Discussion[17]

The fundamental question in this appeal is whether the litigation class, including its subclasses, was properly certified. To be certified, a class must satisfy the four requirements of Rule 23(a), namely: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). The parties seeking class certification bear the burden of establishing by a preponderance of the evidence that the requirements of Rule

[16] PNC petitioned for leave to appeal pursuant to Rule 23(f). That petition was granted on October 12, 2013 by a panel of this court.

[17] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008).

21

23(a) have been met. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). To carry that burden, they must "affirmatively demonstrate" that "there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).

If the Rule 23(a) requirements are met, then a court must consider whether the class fits within one of the three categories of class actions set forth in Rule 23(b). In the present case, the Plaintiffs have chosen to pursue their claims under Rule 23(b)(3), the customary vehicle for obtaining damages. That Rule requires a court to consider whether common questions of law or fact predominate and whether the class action mechanism is the superior method for adjudicating the case. Fed. R. Civ. P. 23(b)(3). The manageability of class litigation is pertinent to those findings. *Id.* We have also recognized that "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Carerra*, 727 F.3d at 305 (internal quotation marks omitted).

As noted at the outset, PNC advances three principal arguments against certification, contending first that there is a class conflict that undermines the adequacy of representation provided by class counsel; second, that the District Court erred by conditionally certifying the class; and, third, that the putative class does not satisfy the demands of Rule 23, particularly the requirements of ascertainability,

commonality, predominance, superiority, or manageability. We consider each argument in turn.[18]

## A.    Adequacy of Representation

The adequacy requirement primarily examines two matters: the interests and incentives of the class

---

[18] PNC also argues that the District Court erred in the following ways: (1) failing to accord ample time for discovery before deciding whether to certify the putative class; (2) limiting class certification briefs to 20 pages; (3) compressing the class certification briefing schedule; (4) limiting counsel's arguments at the class certification hearing; and (5) relying too heavily on dicta from *Community Bank I* and thereby failing to perform an independent analysis of the certification requirements. Those arguments are unpersuasive. As to the first argument, the Plaintiffs respond that, prior to certification, "the parties conducted discovery and exchanged thousands of pages of documents which bore on the propriety of class certification." (Answering Br. at 13.) PNC's only reply appears to be that it would have liked even more discovery, since it apparently failed to engage in rigorous discovery while it waited for the District Court to rule on its motion to dismiss. That is not an adequate response, particularly given that the District Court denied a motion to stay discovery in November 10, 2011, and did not rule on PNC's motion to dismiss until June 12, 2013. As to the second, third, and fourth arguments, PNC provides no legal authority to suggest that any of the alleged defects are grounds for reversal. As to the fifth argument, the District Court adequately addressed each certification requirement in its memorandum opinion, as is more fully discussed herein.

representatives, and the experience and performance of class counsel. *Community Bank I*, 418 F.3d at 303. PNC does not question the adequacy of the class representatives. The argument it raises is directed instead at class counsel. In particular, it asserts that "the 'fundamental' intra-class conflict found by this Court continues to exist because the District Court failed to appoint separate counsel to represent the subclasses it created."[19] (Reply Br. at 1.)

According to PNC, the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), requires that separate counsel be appointed for each subclass. In *Ortiz*, the Supreme Court stated:

> [I]t is obvious after *Amchem* [*Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)] that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel. *See Amchem*, 521 U.S. at 627, … (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected").

---

[19] Although they do not cite the rule, we understand PNC to be challenging counsel's ability to fairly and adequately represent the interests of the class under Rule 23(g)(1)(B).

24

527 U.S. at 856. But PNC provides precious little support for its assertion that the situation in *Ortiz* is present here and that class counsel is conflicted or somehow otherwise inadequate. The passing argument PNC does present fails to persuade us that, in light of *Ortiz* and the case it relies on, *Amchem*, the District Court abused its discretion when it chose not to appoint separate counsel for each subclass. In fact, an argument like PNC's was specifically rejected by the United States Court of Appeals for the Eighth Circuit in *Professional Firefighters Association of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 646-47 (8th Cir. 2012). As the court in that case explained:

> *Ortiz* and *Amchem* were massive tort class actions prompted by the elephantine mass of asbestos cases that defied customary judicial administration. The Supreme Court found the exceedingly divergent interests of present and future claim holders in those cases required separate counsel to address adequately the conflict. But the need for separate representation under the atypical circumstances of *Ortiz* and *Amchem* does not make appointing separate counsel the only acceptable means of addressing any conflicting interests of class members, and providing structural assurance of fair and adequate representation for the entire class.

678 F.3d at 646 (brackets, citations, and internal quotation marks omitted). In other words, the circumstances that required separate counsel in *Ortiz* simply were not present in

*Professional Firefighters*, nor do we think they are present here.

The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class. *Community Bank II*, 622 F.3d at 291. We have explained that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183. More important for our purposes, however, is the corollary principle that class counsel may not, consistent with *Ortiz*, represent an entire class if subgroups within the class have interests that are significantly antagonistic to one another. We must therefore ascertain the alignment of interests within the class and whether conflicts, if any, are serious enough to require separate counsel for each subclass.

Not every intra-class conflict is consequential, but certain ones are what we have called "fundamental." *Dewey*, 681 F.3d at 184. A "fundamental" conflict exists, for example, when some class members "have been harmed by the same conduct that benefitted other members of the class." *Id.* (internal quotation marks omitted). To be "fundamental," a conflict must touch on "'the specific issues in controversy.'" *Id.* (quoting Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:26 (4th ed. 2002)). While it may be wise to appoint separate counsel even before a serious conflict fully emerges, the requirement to put separate counsel in place arises when a conflict ceases to be theoretical and becomes real and fundamental.

In *Community Bank II*, we stated that there was "an obvious and fundamental intra-class conflict of interest" that precluded a finding of adequacy of representation. 622 F.3d at 303. Elaborating, we explained that the conflict of interest stemmed from the fact that the named class representatives had untimely claims under RESPA, TILA, or HOEPA that would require equitable tolling to survive and yet they sought to represent at the settlement negotiating table a sizeable subgroup of class members who had timely claims. *Id*. We said that the "most obvious remedy" for this conflict "would be to create subclasses." *Id*. at 304. On remand, the District Court considered the Plaintiffs' proposed five subclasses, which had been formed "to ameliorate the statute of limitations problems" that we identified in *Community Bank I* and *Community Bank II*. (App. at 18.) The Court noted that CBNV's conduct "was the same as to all class members" and characterized the distinction between the subclasses as merely "a temporal one, that is, when [actionable] conduct occurred." (*Id*.) In short, the Court effectively concluded that there was not a fundamental conflict any longer, now that subclasses had been formed and the putative class was to be certified for litigation rather than settling for a fixed amount.

Unfortunately, PNC spends practically no effort in this appeal trying to demonstrate that any intra-class conflict should now be viewed as "fundamental," even though that issue is essential to its leading argument. It relies on *Community Bank II*'s statement that a fundamental class conflict existed, which defeated certification of the settlement class. PNC accuses the District Court and the Plaintiffs of disregarding, "in the starkest manner possible, an explicit command of [the Third Circuit]." (Opening Br. at 18.) But PNC fails to address the basic change in circumstances that

27

has occurred since *Community Bank II*: we are no longer dealing with a settlement class and a fixed sum to satisfy claims. The Original Plaintiffs and the Objector Plaintiffs have jointly filed a new Complaint that asserts RESPA, TILA/HOEPA, and RICO claims on behalf of all subclasses. Those new circumstances are materially different from the scenarios presented in *Community Bank I*, *Community Bank II*, or the other cases cited by PNC, in which subclasses were jockeying for pieces of a limited settlement pie. By contrast, the subclasses here are not competing for limited settlement funds. All class members can assert all of their available claims, and all class members can, at least in theory, recover all of their damages without impacting the recovery of any other class members.

PNC has provided no reason to believe that, in this new context, the named class representatives of each subclass will not vigorously represent the interests of their fellow class members. They are all pursuing damages under the same statutes and the same theories of liability, and the differences among them will not, at least as things presently stand, pit one group's interests against another. *Cf. In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." (internal quotation marks omitted)). There is thus no fundamental intra-class conflict to prevent class certification, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960 (9th Cir. 2009) (stating parenthetically that the adequacy requirement consists of an "absence of antagonism" (internal quotation marks omitted)), nor is there any derivative conflict of interest that would prevent counsel from

fairly and adequately representing the interests of the entire class.

In summary, the conflict that existed when a settlement class was facing a fixed pool of resources to resolve all claims is, for the time being, no longer a problem that can rightly be called fundamental. Appointing separate counsel, therefore, was not a necessary prerequisite for certification of the subclasses.

We would be remiss, however, if we did not note a problem growing on the horizon, and it is a familiar one by now in this case. If the District Court determines that any subclass's equitable tolling arguments fail, it may well be necessary to appoint separate counsel to represent newly divergent interests. Whether to make any adjustments now, rather than later, is for the District Court to consider when and as it sees fit. The conflict is only a potential one now and not yet imminent. On this record, we cannot say that the District Court abused its discretion in deciding that the adequacy requirement has been satisfied, notwithstanding the joint representation of the subclasses. *Cf. Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) ("To defeat the adequacy requirement … a conflict must be more than merely speculative or hypothetical." (internal quotation marks omitted)); *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2007 WL 2589950, at *11 (D.N.J. Sept. 4, 2007), *aff'd*, 579 F.3d 241 (3d Cir. 2009) ("[A] conflict will not be sufficient to defeat class action unless that conflict is apparent, imminent, and on an issue at the very heart of the suit." (internal quotation marks and brackets omitted)); Alba Conte & Herbert B. Newberg, *Newberg On Class Actions* § 3:58 (5th ed. 2011) ("A conflict must be

manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur."); *id*. § 9:48 (4th ed. 2002) ("When the divergent interests will arise only [later] …, generally the use of subclasses may be deferred until such time as the potential conflicts arise in fact.").

## B.    Conditional Certification

Following certification, the District Court agreed to give the Plaintiffs an opportunity to conduct further discovery touching on merits-related issues.  PNC argues that, in doing so, the District Court conditionally certified the class – an approach that PNC asserts is "entirely backwards" and represents a prohibited practice.  (Opening Br. at 29.)  *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013) ("Certification may not be granted because the plaintiff promises the class will be able to fulfill Rule 23's requirements, with the caveat that the class can always be decertified if it later proves wanting.  To certify a class in this manner is effectively to certify the class conditionally, which Rule 23 does not permit."); *see also In re Nat'l Football League Players Concussion Injury Litig.*, 775 F.3d 570, 579 (3d Cir. 2014) (explaining that the Supreme Court and Congress specifically amended Rule 23 to preclude conditional certification of putative class actions).

PNC relies upon statements made by the Court at a status conference held on August 28, 2013, a month after it had certified the class, to argue that the class was conditionally certified.  For instance, at one point the Court stated, "I want to know what documents you're looking for that will prove your theory not only of the case, but be

30

supportive of the fact that this should be a class action proceeding as opposed to individual cases." (App. at 1824.) After reviewing the transcript of the entire status conference, however, we conclude that the District Court did not impermissibly certify the class on a conditional basis. At that conference, the Court attempted to streamline proceedings going forward, including additional discovery that the Plaintiffs had requested. To that end, the Court discussed the nature and quality of evidence the Plaintiffs were seeking. Although it articulated an expectation that discovery would vindicate its decision to grant class certification, we do not believe that the Court's statements were meant to indicate that the earlier ruling was conditional. PNC points to nothing in the ruling itself to show that it was an impermissible conditional certification. We conclude, therefore, that the class was not conditionally certified.

### C. Other Rule 23 Requirements

#### 1. Ascertainability

"[A]n essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate," *id.* at 593, because, "[i]f a class cannot be ascertained in an economical and administratively feasible manner, significant benefits of a class action are lost," *Carrera*, 727 F.3d at 307 (citation and internal quotation marks omitted). It is the Plaintiffs' burden to show by a preponderance of the evidence that the class is

currently and readily ascertainable. *Id*. at 306. "'A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient.'" *Id.* (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008)) (brackets in original). "A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Id.* at 306. "A critical need of the trial court at certification is to determine how the case will be tried, including how the class is to be ascertained." *Id*. at 307 (citations and internal quotation marks omitted).

PNC asserts that some borrowers may have declared bankruptcy since entering into mortgage loans with CBNV and therefore a bankruptcy estate rather than the borrower may now be the real party in interest. As PNC sees it, that puts at issue the standing of each putative class member and renders ascertainment of the class impossible without substantial individualized inquiry. To determine the standing of each putative class member, PNC claims it would be necessary to determine each of the following facts: (1) whether the putative class member filed for bankruptcy; (2) if so, whether the putative class member disclosed the claims in the bankruptcy proceeding that it now seeks to assert in the class action; and (3) if no such disclosure was made, whether the bankruptcy trustee abandoned the claims such that they may be pursued here.

That argument is mired in speculation, and *Carrera*, the case upon which PNC primarily relies, provides no support. In *Carrera*, the plaintiff sought to certify a nationwide class to sue Bayer Corporation and Bayer Healthcare (collectively "Bayer") for false and deceptive

advertising practices in connection with a product called "One-A-Day WeightSmart." *Id.* at 304. Bayer did not sell the weight-loss pills directly to consumers. *Id.* Instead, the pills were sold in retail stores, which meant that Bayer had no list of purchasers. *Id.* Acknowledging that class members were unlikely to have documentary proof of purchase, the plaintiff proposed two ways to ascertain the class: scour retailer records of online sales or solicit affidavits from prospective class members attesting that they purchased One-A-Day WeightSmart. *Id.* On those facts, we determined that the plaintiff had not met his burden of showing that the class was ascertainable because he failed to adduce sufficient evidence showing that the first method could identify even a single purchaser of One-A-Day-WeightSmart and because the second method would result in too much individualized inquiry. *Id.* at 308-12. The case before us now does not appear to present the evidentiary problems at issue in *Carerra*. On the contrary, PNC possesses all of the relevant bank records needed to identify the putative class members.

PNC's ruminations about bankruptcy are not persuasive. First, we have held that only named plaintiffs, and not unnamed class members, need to establish standing. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306-07 (3d Cir. 1998); *see also Lowden v. T-Mobile USA, Inc*., 512 F.3d 1213, 1215 n.1 (9th Cir. 2008) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements."). Second, unlike in *Carrera* and other cases in which putative class members were not ascertainable, the Plaintiffs here have identified a reliable, repeatable process whereby members of the putative class may be identified: consult CBNV's business records and then follow a few steps to determine

33

whether the borrower is the real party in interest. PNC has cited no authority holding that such an inquiry is onerous enough to defeat the ascertainability requirement. And, even if the inquiry were difficult, PNC has adduced no evidence whatsoever suggesting that many – or even any – members of the class are actually embroiled in bankruptcy proceedings. Because PNC relies solely on speculation, it has not demonstrated that the District Court abused its discretion in ruling for the Plaintiffs on this issue.

### 2. Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted). The bar is not high; we have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994); when class members did not have identical claims, *In re Prudential Ins.*, 148 F.3d at 311; and, most dramatically, when some members' claims were arguably not even viable, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305-07 (3d Cir. 2011) (en banc). In reaching those conclusions, we explained that the focus of the commonality inquiry is not on the strength of each class member's claims but instead "on whether the defendant's conduct was common as to all of the class members." *Sullivan*, 667 F.3d at 298; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (focusing the commonality inquiry on the defendant's conduct, not "on the conduct of individual class members"); *Newtown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154,

34

183 (3d Cir. 2001) (identifying common questions regarding the defendant's conduct); *Baby Neal*, 43 F.3d at 57 (considering only whether the defendant "engag[ed] in a common course of conduct toward" the class members). In other words, as long as all putative class members were subjected to the same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members. *Baby Neal*, 43 F.3d at 56.

That said, the Supreme Court has emphasized that the claims of each class member "must depend upon a common contention." *Wal-Mart*, 131 S. Ct. at 2551. "The 'common contention … must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sullivan*, 667 F.3d at 335 (Scirica, J., concurring) (quoting *Wal-Mart*, 131 S. Ct. at 2551). Thus, "[w]hat matters to class certification … is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis and ellipsis in original) (internal quotation marks omitted).

We noted in *Community Bank I*, in dicta, our impression that the commonality requirement was satisfied in this case. 418 F.3d at 303 ("[T]he named plaintiffs share at least one question of fact or law with the grievances of the prospective class." (internal quotation marks omitted)). Relying on *Community Bank I*, the District Court concluded that the commonality requirement was satisfied because "the claims of all class members … depend on the existence of the Shumway scheme" and "[t]he viability of these claims is

ascertainable by examining identical loan documents." (App. at 15 (internal quotation marks omitted).) PNC asserts that the District Court erred in that conclusion in a number of ways. First, it contends that each class member's loan documents will "differ markedly on matters including interest rates, the existence/amount of discount fees, the title services provided, the amounts charged and prepayment features." (Opening Br. at 34.) Second, it asserts that, because fees charged to putative class members varied in type and amount, resolution of the disputed factual issues regarding those fees would require loan-by-loan analysis of each fee paid and each service performed. PNC thus argues that class certification is foreclosed by *Wal-Mart*.

We disagree. In *Wal-Mart*, the Supreme Court explained how the commonality standard applies when the complained-of conduct is a discretionary corporate policy that allegedly has a discriminatory effect. The putative class in that case consisted of "all women employed at any Wal-Mart domestic retail store at any time since December 26, 1998, who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." 131 S. Ct. at 2549 (brackets and internal quotation marks omitted). Plaintiffs representing that enormous class of about 1.5 million women alleged that Wal-Mart's policy of "allowing discretion by local supervisors over employment matters" produced a disparate discriminatory impact, evidenced by a statistical analysis of the company's employment information. *Id.* at 2547, 2554 (emphasis omitted). The Supreme Court concluded that such evidence was insufficient to establish commonality. While acknowledging that "giving discretion to lower-level supervisors can," in some circumstances, "be the basis of

36

Title VII liability under a disparate-impact theory," *id*. at 2554, the Supreme Court in *Wal-Mart* quoted *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988), to emphasize that such claims must do more than "merely prov[e] that the discretionary system has produced a racial or sexual disparity" – they must also identify "the specific employment practice that is challenged," *Wal-Mart*, 131 S. Ct. at 2555 (internal quotation marks omitted). Moreover, *Wal-Mart* explained that, to bring a case as a class action, the named plaintiffs must show that each class member was subjected to the specifically challenged practice in roughly the same manner. *Id*. at 2555-56. The members of the putative class were all subjected to the discretion of their supervisors, but the plaintiffs had not demonstrated "a common mode of exercising discretion that pervades the entire company," *id*. at 2554-55, such that the policy could be considered a "uniform employment practice" that all members of the putative class had experienced, *id*. at 2554. Rather, members of the proposed class encountered different managers making different types of employment decisions for different reasons, many of them potentially nondiscriminatory in nature. The plaintiffs, therefore, had not demonstrated a common harm, and the proposed class lacked commonality. *Id*. at 2555.

The claims at issue here differ markedly from those in *Wal-Mart*. Unlike the *Wal-Mart* plaintiffs, the Plaintiffs in this case have alleged that the class was subjected to the same kind of illegal conduct by the same entities, and that class members were harmed in the same way, albeit to potentially different extents. Specifically, the Plaintiffs allege that CBNV operated a residential mortgage assembly line that included unlawful loans characterized by illegal kickbacks, materially inaccurate disclosures of the annual percentage

37

rates ("APR") to be applied, and repeated mail and wire fraud. As the Plaintiffs rightly point out, the following questions are common to each class member and will generate common answers:

(1)     Whether the structure created by CBNV and the loan production officers resulted in an unlawful kickback scheme that was a per se violation of RESPA.

(2)     Whether CBNV's uniform method of excluding certain title charges from the APR calculation resulted in inaccurate TILA/HOEPA disclosures.

(3)     Whether CBNV's acts tolled the claims of class members.

(4)     Whether the evidence presented proves a RICO conspiracy.

While some individualized determinations may be necessary to completely resolve the claims of each putative class member in this case, those are not the focus of the commonality inquiry. Instead, we must determine whether the Plaintiffs have sufficiently demonstrated that "the defendant's conduct was common as to all of the class members." *Sullivan*, 667 F.3d at 298. In our judgment, they have.

### 3.     Predominance

"Issues common to the class must predominate over individual issues." *In re Prudential Ins*., 148 F.3d at 313-14. This requirement under Rule 23(b) "tests whether proposed

38

classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. It is a "far more demanding" standard than the commonality requirement of Rule 23(a), *id*. at 623-24. "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide*, 552 F.3d at 311 (citations and internal quotation marks omitted). "If proof of the *essential elements* of the cause of action requires individual treatment, then class certification is unsuitable." *Newton*, 259 F.3d at 172 (emphasis added); *see also Hayes*, 725 F.3d at 359 ("[T]he predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence."). Accordingly, we must examine the elements of the Plaintiffs' claims "through the prism" of Rule 23 to determine whether the District Court properly certified the class. *Newton*, 259 F.3d at 181.

Quoting our dicta in *Community Bank I*, the District Court noted that "'[a]ll plaintiffs' claims arise from the same alleged fraudulent scheme.'" (App. at 19 (quoting *Community Bank I*, 418 F.3d at 309).) The Court also repeated our statement that "the record … supports a finding of … predominance." (App. at 19; *see also Community Bank II*, 622 F.3d at 284.)

PNC argues that the predominance requirement is not satisfied for a number of reasons: first, because a determination of putative class members' standing based on

prior bankruptcies is highly individualized, it defeats the predominance requirement; second, equitable tolling is required for many of the putative class members' RESPA and TILA/HOEPA claims to remain viable, and equitable tolling is a highly individualized inquiry; third, various elements of the Plaintiffs' RESPA claims require individual analysis; fourth, the Plaintiffs' TILA/HOEPA claims present substantial individualized issues; and fifth, the Plaintiffs' RICO claims contain individual issues that would predominate. None of those arguments succeeds.

### a. Standing

PNC asserts that, "[b]ecause a determination of putative class members' standing (or lack thereof) based on prior bankruptcies is highly individualized, it defeats the predominance requirement as well." (Opening Br. at 37.) PNC offers no additional argument or elaboration on this assertion. For the reasons discussed above regarding ascertainability and standing, the argument is unpersuasive and requires no further consideration. *See supra* pp. 31-34.

### b. Equitable Tolling

According to PNC, equitable tolling is a "highly individualized" inquiry that is not susceptible to common proof, and inquiries about equitable tolling will predominate in the litigation. (Opening Br. at 37-38.)

Equitable tolling permits a plaintiff to sue after the statutory time period for filing a complaint has expired "(1) [if] the defendant has actively misled the plaintiff respecting the plaintiff's cause of action, (2) [if] the plaintiff in some

40

extraordinary way has been prevented from asserting his or her rights, or (3) [if] the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994); *see also Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998) (holding that equitable tolling is an appropriate remedy when principles of equity would make a rigid application of the statute of limitations unfair).

The Plaintiffs invoke equitable tolling based on what they allege is fraudulent concealment, and they thereby seek to preserve the timeliness of certain putative class members' RESPA and TILA/HOEPA claims.[20] The fraudulent

---

[20] PNC does not dispute that the doctrine of equitable tolling is available to toll the relevant statutes of limitations. We have concluded that TILA's statute of limitations "is not jurisdictional and is therefore subject to equitable tolling." *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 505 (3d Cir. 1998). We based our conclusion on the statute's text, structure, and policy. *Id.* at 502-04. For purposes of determining whether the two statutes are jurisdictional, the text and structure of the limitations statute in TILA and RESPA are substantively similar. *Compare* 12 U.S.C. § 2614 (RESPA), *with* 15 U.S.C. § 1640(e) (TILA). The two schemes also share similar purposes. *Compare* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result– (1) in more effective advance disclosure to home buyers and sellers of settlement costs; (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services … ."), *with* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter

concealment doctrine operates to stop the statute of limitations from running in circumstances when the accrual date of a claim has passed but the "plaintiff's cause of action has been obscured by the defendant's conduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002). The plaintiff has the burden of proving fraudulent concealment, which requires a three-part showing: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts." *Cetel v. Kirwan Fin. Grp.*, 460 F.3d 494, 509 (3d Cir. 2006).

PNC argues that the "actively misled" and "reasonable due diligence" components will require individualized fact finding, which undermines any claim of predominance.

---

to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit … ."). We therefore conclude that, like TILA, the statute of limitations in RESPA is not jurisdictional and is thus subject to equitable tolling. *See Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166-67 (7th Cir. 1997) (holding that RESPA's statute of limitations is subject to equitable tolling). *But see Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038 (D.C. Cir. 1986) (concluding that the limitation in RESPA is jurisdictional).

### i.     Active Misleading

As PNC points out, "a plaintiff seeking to demonstrate fraudulent concealment of a claim must prove that the defendant took affirmative steps to mislead the plaintiff with respect to the claim."  (Opening Br. at 41.)  *See Oshiver*, 38 F.3d at 1391 n.10 (refusing to apply equitable tolling to the plaintiff's failure-to-hire claim because the plaintiff did not allege that the defendant affirmatively misled her).  PNC also notes that proof of active misleading generally requires a plaintiff to demonstrate "'efforts by the defendant – above and beyond the wrongdoing upon which the plaintiff's claim is founded – to prevent the plaintiff from suing in time.'"  (Opening Br. at 41-42 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)).)  PNC contends that, as a result, "'[f]or a RESPA claim to warrant equitable tolling, mere silence or nondisclosure is not enough to trigger estoppel[;] the adversary must commit some affirmative independent act of concealment upon which the plaintiffs justifiably rely in order to toll the statute.'"  (Opening Br. at 42 (brackets in original) (emphasis omitted) (quoting *Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp. 2d 505, 516 (E.D. Pa. 2009)).)  Similarly, PNC asserts that, in the TILA context, "'[t]he fraudulent act that forms the basis of a claim for damages under the TILA will not satisfy the factual showing required to invoke the equitable tolling doctrine of fraudulent concealment.'"  (Opening Br. at 42 (brackets in original) (quoting *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 551 (W.D. Pa. 2009)).)  Thus, PNC argues, because each putative class member must demonstrate an independent misrepresentation (in addition to the allegedly misleading loan closing documents) that he or she relied

43

upon, more individualized inquiry is necessary to resolve the equitable tolling issue embedded in the Plaintiffs' RESPA and TILA/HOEPA claims than is permitted under the predominance requirement.

The Plaintiffs counter that no independent act of concealment is necessary where the wrong is "self-concealing." (Answering Br. at 33.) *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1535 n.28 (11th Cir. 1987) (stating that where concealment is inherent in the nature of the wrong, all that is necessary to toll the statute of limitations is a plaintiff's due diligence in seeking to discover the fraud). They also contend that "[n]owhere in any of the seminal Third Circuit equitable tolling decisions is there any mandate that some further act of concealment is necessary to invoke the doctrine where the wrong is self-concealing." (Answering Br. at 34 n.16 (citing *Oshiver*, 38 F.3d 1380; *Ramadan v. Chase Manhattan Bank*, 156 F.3d 499 (3d Cir. 2006); *Cetel*, 460 F.3d 494).

Because the Plaintiffs have advanced a sufficiently credible argument that PNC's predecessor in interest, CBNV, did commit an affirmative act of concealment, we do not need to decide whether mere silence is enough to allow the case to proceed.

The Plaintiffs are able to claim an independent act of concealment with respect to each loan because CBNV allegedly misrepresented material facts in the HUD–1 settlement statements used in closing the loans of every class member, and those misrepresentations arguably support application of equitable tolling. More specifically, the additional act of concealment perpetrated by CBNV was,

44

according to the Plaintiffs, providing a HUD–1 that contained false representations as to the destination of the settlement fees (for the RESPA claims) and a false representation that a title company performed a bona fide title search and title examination (for the TILA/HOEPA claims). *See Reiser v. Residential Funding Corp.*, 420 F. Supp. 2d 940, 947 (S.D. Ill. 2004) (holding that plaintiffs adequately pled equitable tolling as to their RESPA and TILA claims by alleging that defendants had misrepresented and concealed facts relating to fees represented on the HUD–1 statements), *rev'd in part on other grounds*, 380 F.3d 1027 (7th Cir. 2004).

PNC, of course, disagrees that transmission of a HUD–1 to a class member can constitute an "independent act" of concealment sufficient to invoke the doctrine of equitable tolling as to the RESPA or TILA/HOEPA claims. Its argument is primarily based on *Moll v. U.S. Life Title Insurance Company of New York*, 700 F. Supp. 1284 (S.D.N.Y. 1988), which rejected the argument that we now accept – that transmission of a misleading HUD–1 constitutes an independent act of concealment. The *Moll* plaintiffs argued that the HUD–1s "falsely stated that US Life would receive the full premium charged for the title insurance," when in fact portions of that premium were allegedly "kicked back" to another entity. *Id*. at 1292-93. But *Moll* reasoned that the HUD–1s made no representation as to "the ultimate disposition of those charges," and particularly, that the HUD–1s did not represent that the defendant "was 'accepting' (*i.e.*, retaining for its own account) the premium charged." *Id*. at 1291-92 (additional internal quotation marks omitted). Instead, *Moll* concluded that the HUD–1s simply reported the charges actually assessed to and paid by the plaintiffs, and the forms did so without warranting anything about the validity

or ultimate disposition of the disputed charges.  Because the amounts listed were accurate – that is, they were the amounts that plaintiffs had actually paid – *Moll* concluded that transmission of a HUD–1 did not constitute an independent act of concealment because it did not contain any false information.  *Id*. at 1292-93.

There is, however, a gap in that logic.  Even assuming that a HUD–1 correctly summarizes the fees and charges actually paid by a borrower for settlement services in connection with a federally related mortgage loan, it does not follow that the HUD–1 should be viewed in isolation.  Federal regulations associated with that form control the nature and quality of information that is supposed to be included in each HUD–1, and borrowers should be able to rely on that information in fact being of the requisite nature and quality.  Of particular relevance here, 24 C.F.R. § 3500.8 provides the following:

> The settlement agent shall state the actual charges paid by the borrower and seller on the HUD–1, or by the borrower on the HUD–1A.  The settlement agent must separately itemize each third party charge paid by the borrower and seller.  All origination services performed by or on behalf of the loan originator must be included in the loan originator's own charge.  Administrative and processing services related to title services must be included in the title underwriter's or title agent's own charge.  The amount stated on the HUD–1 or HUD–1A for any itemized service cannot exceed the amount actually received by the settlement service

46

provider for that itemized service, unless the charge is an average charge in accordance with paragraph (b)(2) of this section.[21]

HUD–1s that deviate from the requirements of section 3500.8 thus can be materially misleading because transmission of a HUD–1 impliedly warrants compliance with that section's specific requirements. We therefore conclude that inclusion of misleading information in a HUD–1 can constitute an independent act of concealment. *Cf. White v. PNC Fin. Servs. Grp.*, No. 11-7928, 2014 WL 4063344, at *2-4 (E.D. Pa. Aug. 18, 2014); *Barlee v. First Horizon Nat'l Corp.*, No. 12-3045, 2013 WL 706091, at *4-5 (E.D. Pa. Feb. 27, 2013). Under the facts of this case, a common question as to active misleading predominates over any individualized issues.

### ii. Reasonable Due Diligence

To qualify for equitable tolling, however, the Plaintiffs must show not only an act of concealment, but reasonable diligence on their own part as well. "To demonstrate

---

[21] This version of section 3500.8 was promulgated in November 2008. *See* Real Estate Settlement Procedures Act (RESPA): Rule To Simplify and Improve the Process of Obtaining Mortgages and Reduce Consumer Settlement Costs, 73 Fed. Reg. 68204, 68241 (November 17, 2008). But it was removed in June 2014, *see* Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34224, 34225 (June 16, 2014). It now appears at 12 C.F.R. § 1024.8(b)(1). Relevant for our purposes, a prior version of section 3500.8 that was in effect in 1998 imposed substantially identical reporting requirements for HUD–1s.

reasonable diligence, a plaintiff must establish that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Mest v. Cabot Corp.*, 449 F.3d 502, 511 (3d Cir. 2006) (brackets and internal quotation marks omitted).

Relying on *Riddle v. Bank of America Corp.*, No. 12-1740, 2013 WL 6061363 (E.D. Pa. Nov. 18, 2013) *aff'd*, 588 F. App'x 127 (3d Cir. 2014), PNC argues that the reasonable diligence component of the equitable tolling inquiry is not susceptible to common proof but, instead, that each class member will need to be queried about his individual knowledge and attempts to discover his claims before the limitations period expired. Addressing the merits of equitable tolling and not the issue of certification in the putative class action, *Riddle* analyzed in detail evidence regarding each named plaintiff's diligence before concluding that plaintiffs could not pursue equitable tolling of the limitations period on their RESPA claim. *Id*. at \*2-4, \*5-7. We do not dispute that reasonable diligence is generally a fact-specific inquiry. But when a wrongful scheme is perpetrated through the use of common documentation, such as the documents employed to memorialize each putative class member's mortgage loan, full participation in the loan process is alone sufficient to establish the due diligence element. *Cf. Cunningham v. M & T Bank Corp.*, No. 1:12-cv-1238, 2013 WL 5876337, at \*6 (M.D. Pa. Oct. 30, 2013) (finding that allegations that the putative class fully participated in all aspects of the mortgage loan transactions and reviewed all relevant documents, but were nonetheless unable to discover the RESPA violation, were

48

sufficient to satisfy the reasonable diligence requirement for equitable tolling at the pleading stage).

The rationale for holding that participation in the mortgage loan process can establish the "due diligence" element of equitable tolling was explained in *Bradford v. WR Starkey Mortgage, LLP*, No. 2:06-CV-86, 2008 WL 4501957 (N.D. Ga. Feb. 22, 2008), in which the court stated, "Plaintiff had no reason to suspect that defendant, or any other lender, might be improperly marking-up settlement charges, and the due diligence requirement does not demand that plaintiff inquire about the various fees at issue." *Id*. at \*3. *Bradford* specifically rejected the same argument made here by PNC, saying that, "[h]aving flouted the regulation, defendant cannot now try to penalize plaintiff for trusting the validity of the settlement costs delineated on his HUD–1 Statement." *Id*. at \*3 n.6.

We agree with that conclusion. Due diligence does not mean that borrowers must presume their bank is lying or dissembling and therefore that further investigation is needed. Reading the blizzard of paper that sweeps before them is ample diligence in itself. In short, a borrower ought to be able to rely on the documents provided by a financial institution. Indeed, RESPA and TILA/HOEPA were passed, in large part, because Congress recognized that the average borrower is incapable of detecting many unfair lending practices, including fraud. "[W]hile the law of fraud does not endorse a 'hear no evil, see no evil approach,' neither does it require that an aggrieved party have proceeded from the outset as though he were dealing with thieves." *Jones v. Childers*, 18 F.3d 899, 907 (11th Cir. 1994) (additional quotation marks omitted). "A plaintiff … cannot be expected

49

to exercise diligence unless there is some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1282 (3d Cir. 1991) (internal quotation marks omitted). The Complaint here does not allege any facts disclosed on the face of the HUD–1s or that were otherwise provided to the Plaintiffs that should have awakened inquiry and demanded some further diligence. We conclude, therefore, that the Plaintiffs' allegation that the class fully participated in all aspects of the mortgage loan transactions by "reviewing their loan documentation" is sufficient to satisfy the reasonable diligence requirement for equitable tolling in this case. (App. at 307, ¶ 409.) *Cf. White*, 2014 WL 4063344, at *5-6. In addition, proving that class members did, in fact, fully participate in the loan process in that fashion does not cause the issue of equitable tolling to predominate over issues common to the whole class.

We do not address whether the class members are actually entitled to equitable tolling on the merits. Equitable tolling "is extended only sparingly" and under "sufficiently inequitable circumstances." *Glover v. FDIC*, 698 F.3d 139, 151 (3d Cir. 2012) (internal quotation marks omitted). The Plaintiffs may ultimately be unable to demonstrate that they are factually entitled to its benefits. We only conclude here that the common issues of fact and law predominate over individual ones such that the issue is suitable for class-wide treatment on the merits.

### c.     RESPA Claims

PNC advances several arguments for why the Plaintiffs' RESPA claims – quite apart from equitable tolling concerns – present individualized issues that would predominate in this litigation and should therefore prevent class certification.[22]     First, it asserts that, to litigate the RESPA claims, the putative class will be required to demonstrate on a loan-by-loan basis that no services were provided in exchange for the alleged kickbacks.     But the Complaint alleges that Equity Plus performed absolutely no services to earn the transferred (*i.e.*, kicked-back) portion of the fees, which is at least plausible in light of the contractual arrangement between Equity Plus and CBNV.[23]     While that

---

[22] PNC urges us to acknowledge, as other circuits have, that RESPA section 8 kickback cases are generally not a good fit for class certification.  *See, e.g.*, *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 526, 530 (7th Cir. 2012) ("Class actions are rare in RESPA Section 8 cases" because "at the class certification stage … the existence or the amount of the kickback … generally requires an individual analysis of each alleged kickback to compare the services performed with the payment made.").     There is no need for us to consider that broad statement, though, because a narrower holding is appropriate here.

[23] According to the Plaintiffs, whether or not services were provided in exchange for kickbacks will not be in dispute at trial because Equity Plus was contractually barred from performing mortgage broker services under a consulting agreement between CBNV and Equity Plus.  PNC responds that the agreement merely states that Equity Plus "will not act as a mortgage broker," but it does not state that Equity Plus

51

allegation places a potentially onerous evidentiary burden on the Plaintiffs, it also leads us to conclude that, on the present record and at this stage of the case, PNC's arguments fail to show that the District Court abused its discretion.

Second, PNC asserts that "there are several different types of [fees] that Plaintiffs are complaining about, and not all putative class members paid every such fee." (Opening Br. at 48.) PNC contends that, as a result, the fact-finder will be required to determine what fees were assessed to each individual class member and whether Equity Plus performed services in exchange for each fee, and that such individual determinations would predominate in the litigation. That argument is also unpersuasive because, again, Equity Plus – the recipient of the settlement fees at issue in this case – allegedly performed no mortgage broker services in exchange for the fees and was contractually precluded from providing any services.

PNC's third and fourth arguments can be addressed simultaneously. The third argument is that any claims premised on alleged violations of the affiliated business arrangement ("ABA") disclosure requirements of RESPA would require loan-by-loan analysis of the ABA

---

will not perform other types of services in exchange for the fees at issue. (Opening Br. at 47 (internal quotation marks omitted).) In fact, PNC argues, portions of the agreement suggest that Equity Plus is actually required to perform services at CBNV's request, and PNC claims that it did perform a variety of services pursuant to its obligations under that agreement.

disclosures.[24] The fourth argument is that any claims premised on CBNV's alleged practice of charging "discount fees" without providing a discount interest rate in exchange would require an examination of each individual loan to see whether the borrower was charged a discount fee, and if so, whether the borrower obtained a discount or some other benefit as consideration for the fee. We need not address the merits of either of those arguments, however, because the alleged violations of the ABA disclosure requirements and the alleged discount fee practice are not essential to the Plaintiffs' RESPA claims. The elements of the Plaintiffs' RESPA claims that are "essential" – namely violations of the anti-kickback and unearned fee provisions of RESPA – can potentially be proven with common evidence. *Hayes*, 725 F.3d at 359 ("[T]he predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence.").

------

[24] RESPA has provisions and regulations relating to business arrangements between real estate brokerage firms and affiliated settlement service provides. A referrer may only refer to affiliates if the following three requirements are met: (1) disclosure is given to the consumer at or before the time each referral is made, in the form prescribed by regulation; (2) the consumer is not required to use any particular provider of settlement services; and (3) the only thing of value that is received from the arrangement, other than reasonable payments for good, facilities, or services furnished, is a return on the ownership interest the affiliates may have in one another. 12 C.F.R. § 1024.15(b) (earlier codified at 24 C.F.R. § 3500.15(b)).

53

Finally, PNC argues that a damages issue precludes class certification. While RESPA permits recovery "in an amount equal to three times *the amount of any charge paid*," 12 U.S.C. § 2607(d)(2) (emphasis added), PNC contends that many class members did not pay the fees directly, receiving reduced loan distributions instead. As a result, says PNC, in addition to individualized determinations at the liability stage, each class member will be required at the damages stage of the case to demonstrate that he actually paid the fees instead of receiving reduced distributions. But PNC gives no reason why the distinction between an indirect payment of fees (*i.e.*, by subtracting the fee from the loan distribution) and a direct payment has any legal or practical significance, and none occurs to us.

In sum, none of these issues defeats the Plaintiffs' showing of predominance as to the RESPA claims.

### d.  TILA/HOEPA Claims

PNC advances three arguments for why the Plaintiffs' TILA/HOEPA claims present individualized issues that would predominate at trial and thereby prevent class certification. First, it asserts that those claims will require the class to show that its members paid fees that were not "'bona fide and reasonable in amount.'" (Opening Br. at 51 (quoting 12 C.F.R. § 226.4(c)(7)).) That showing, PNC contends, would require loan-by-loan and fee-by-fee analysis in the context of every real estate market in which each transaction occurred. The Plaintiffs assert that CBNV improperly excluded certain charges from its APR calculation – improper charges that were added to every loan – that resulted in a

54

materially misstated APR.[25]   Contrary to what PNC argues, whether the fees were in fact excluded from the APR calculation requires simple arithmetic.  *Community Bank I*, 418 F.3d at 306 ("Whether an individual borrower has a viable TILA or HOEPA claim may be determinable by conducting simple arithmetic computations on certain figures obtained from the face of each loan's TILA Disclosure Statement.").  And the Plaintiffs contend that whether the fees were bona fide can be resolved by classwide evidence: first, whether CBNV performed independent title abstract or title searches or whether it merely paid a third party entity to perform a perfunctory current-owner search that generated a "property report," which is not the same thing as performing a

---

[25] The Plaintiffs explain the method employed to calculate the APR as follows (the references to line numbers being to the lines on the HUD-1 forms):

> The APR is calculated through a mathematical formula derived from the Amount Financed ([*i.e.*,] funds actually available to the borrower) and [the] Finance Charge ([*i.e.*,] the costs incidental to the extension of credit).  These two numbers are mutually exclusive; a settlement charge is allocated to either one or the other, but not to both.  Title related charges like the line 1102 fee, a title search or title abstract fee, or the line 1103 a title examination fee may be excluded from the calculation of the Finance Charge (resulting in a lower APR), but only if those fees are "bona fide and reasonable in amount."  12 CFR § 226.4(c)(7).

(Answering Br. at 46.)

bona fide title search; and second, whether CBNV performed a bona fide title examination or whether it paid a title examination company to review the "property report," which does not constitute a true title examination. The District Court evidently accepted those arguments, and, at this stage and on this record, we see no abuse of discretion in that decision.

Second, PNC contends that the Plaintiffs' TILA/HOEPA claims premised on deficient HOEPA disclosures will require loan-by-loan analysis because the loan documents were not uniform from putative class member to putative class member. But, even assuming that PNC is correct, those possible issues do not affect the principal violations of TILA/HOEPA alleged in the Complaint and so do not undermine the District Court's decision on predominance.

Third, PNC contends that the Plaintiffs' TILA/HOEPA claims premised on CBNV's failure to provide HOEPA notices to borrowers three days before closing will also require significant individual inquiry because numerous CBNV files contain the borrower's signed acknowledgment of timely receipt of the HOEPA notice or an overnight mail receipt demonstrating timely delivery, all of which demonstrates that there was no uniform policy to not provide notices. The Plaintiffs respond that, while their Complaint alleges that CBNV failed to provide timely HOEPA disclosures and that such a failure is grounds for relief under TILA/HOEPA, PNC's argument is beside the point of their claim. The Plaintiffs say that the primary means by which CBNV violated the advance notice provisions was by including *inaccurate* – not untimely – information in the

HOEPA disclosure, and that the inaccuracy of CBNV's HOEPA disclosures can be proven with classwide evidence. Therefore, the Plaintiffs argue, PNC's contention that each class member must testify as to whether he received his HOEPA disclosure in a timely manner misses the mark because the timeliness of the disclosure is not the alleged basis of liability.

While the Plaintiffs' argument downplays the actual language of their pleading – language that does assert the timeliness of the HOEPA disclosures as a basis of liability, completely separate from the accuracy of the disclosures – PNC has failed to demonstrate that the District Court erred in determining that the timeliness issue does not create evidentiary problems that will predominate in the litigation. The timeliness issue might be systematically resolved as to each class member by either consulting CBNV's files, which contain signed acknowledgements of delivery and mail receipts, or by inspecting mail carriers' documentation. More importantly, though, even if individualized inquiries predominate this particular TILA/HOEPA basis for liability and thus suggest that it not be handled as a class claim, that does not undermine the predominance of the primary claims of liability for TILA/HOEPA violations, namely, the delivery of inaccurate information.

### e.    RICO Claims

PNC also advances three arguments for why the Plaintiffs' RICO claims present individualized issues that would predominate and should therefore prevent class

certification.[26]  First, PNC asserts that there is no support for the Plaintiffs' contention that reliance may be presumed for purposes of their RICO claim and thus it will be necessary for each class member to prove individual reliance.  The Plaintiffs respond that they can prove their RICO claims with the same classwide evidence that will be used to prove the RESPA and TILA/HOEPA claims.  And, they say, "where proof of the RICO violation is demonstrated through common evidence of a common scheme, reliance may be inferred on a classwide basis."  (Answering Br. at 52.)  Again, on this record and in this context, we do not believe that the District Court abused its discretion in accepting the Plaintiffs' position.

---

[26] To plead a violation of section 1962(c), plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (internal quotation marks omitted).  "Racketeering activity" is defined to include a list of state and federal offenses, 18 U.S.C. § 1961(1), two of which are the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343.  Here, Plaintiffs allege that the predicate acts are the defendants' actions that underlie the RESPA and TILA/HOEPA violations.  "While the Supreme Court has clarified that first-party reliance is not an element of a RICO claim predicated on mail fraud, it may be … a necessary part of the causation theory advanced by the plaintiffs."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 n.6 (2d Cir. 2013) (internal quotation marks omitted) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008)).

Second, PNC asserts that the question of whether each settlement fee at issue was somehow improper will require a loan-by-loan and fee-by-fee analysis and, therefore, that individualized fact inquiries at the damages stage of each RICO claim preclude class certification. That argument, though, is mistaken. The Plaintiffs do not allege that Equity Plus performed inadequate services in exchange for fees. Their argument, again, is that class-wide evidence demonstrates that Equity Plus performed no services in exchange for settlement charges.

Third, PNC argues that the Plaintiffs cannot "set forth … [classwide] proof [of] actual monetary loss," as is required to sustain a RICO claim. (Opening Br. at 59 (internal quotation marks omitted).) Individual issues will predominate, says PNC, because the Plaintiffs will need to demonstrate the difference between the fees that they paid and the fees that they should have paid. Once more, for the reasons set forth above, that argument fails – the Plaintiffs do not assert that Equity Plus rendered inadequate services for which class members are entitled to claw back part of the fee. They assert that Equity Plus performed no services and was entitled to no fee at all. For that reason, it was not an abuse of discretion for the District Court to conclude in effect that individualized inquiry will not be necessary.

### 4.    Superiority

Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy," and it provides a non-exhaustive list of factors to consider in determining superiority, including: the class members' interest in

59

individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Community Bank I*, 418 F.3d at 309 (internal quotation marks omitted).

The District Court relied on our statement in *Community Bank I* that there is "no reason … why a Rule 23(b)(3) class action is not the superior means to adjudicate this matter." *Id*. The District Court also observed that "class members would face some difficult, if not insurmountable, tolling issues if they were required to file suit on their own behalf at this time." (App. at 19.)

PNC's response is that the District Court erred on the superiority issue in that "[t]olling of individual suits based on previously-filed class action litigation … is a non-issue because of the class action tolling rule"[27] and that "[a]n individual plaintiff would be in the same position, vis-à-vis

---

[27] Under the class action tolling rule, the filing of a class action lawsuit in federal court tolls the statute of limitation for the claims of unnamed class members until class certification is denied or when the member ceases to be part of the class, at which point the class member may intervene or file an individual suit. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551-53 (1974).

the statute of limitations, as he or she would be as a class member." (Opening Br. at 61.) PNC also asserts that, because putative class members' HOEPA claims average well over $28,000 and because they are pursuing statutory claims that permit recovery of their attorneys' fees, this case involves the sorts of claims that individuals would have an incentive to pursue on their own.

Those assertions, however, fail to account for the "difficult, if not insurmountable" issues noted by the District Court that class members would need to overcome in filing individual lawsuits "almost a decade after [class members] first received notice that this case had been prosecuted and settled for them." (App. at 19). In addition, PNC does not consider the tremendous burden that presiding over tens of thousands of nearly identical cases alleging RESPA, TILA, HOEPA, and RICO claims would impose on the courts. The District Court did not abuse its discretion in finding that the superiority requirement is satisfied in this case.

### 5. Manageability

Finally, PNC argues that the District Court erred on manageability. It first says that "the same factors that defeat commonality and predominance … also make this case unmanageable as a class action." (Opening Br. at 62.) Because we have concluded that the District Court cannot be faulted for deciding that the commonality and predominance requirements for class certification have been satisfied, this tag-along argument fails.

PNC further contends that the District Court's acknowledgement that damages issues would require

individualized inquiry – while dismissing as "premature" and "speculative" any consideration of solutions to address that difficulty – "is tantamount to an affirmative finding that the manageability requirement is not satisfied." (*Id*.) That manageability argument fares no better than the first. As the District Court noted, "Rule 23(d) vests in the Court substantial discretion to enter orders, subsequent to the Order Certifying the Class that will follow, to manage the class." (App. at 19.) Moreover, there are "'imaginative solutions to problems created by the presence in a class action litigation of individual damages.'" (*Id*. at 19-20 (quoting *Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004).) By refusing to settle on any particular solution at the same time that it certified the class, the District Court was not ruling that the litigation was unmanageable. That a class action may require some inquiry into facts specific to individual class members, such as damages, is not a novel observation, nor does it necessarily mean that a class action will be unmanageable. The District Court did not err by deciding that it could address this aspect of case management more fully at a later date.

## III.    Conclusion

Thus ends the third and, one hopes, the last quinquennial presentation of class certification questions to this court in this case. PNC has failed to demonstrate that the District Court abused its discretion as to any certification issue or requirement, and we will therefore affirm.